# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 03, 2020

Mr. Jon David Brittingham
Mr. Jason Robbins Goldschmidt
Dinsmore, 255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202

Mr. Jerome Anthony Kunkel
Mr. Eric Adam Munas
Hamilton County Prosecutor's Office
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202

Mr. Ted L. Wills
414 Walnut Street, Suite 707 Mercantile Library Building
Cincinnati, OH 45202-0000

Re:  Case No. 18-4179, *Joseph Siefert, et al v. Hamilton County Board of Comm., et al*
Originating Case No. : 1:17-cv-00511

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0066p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

JOSEPH SIEFERT; MELISSA SIEFERT,

     *Plaintiffs-Appellants*,

  *v.*

HAMILTON COUNTY; BOARD OF HAMILTON COUNTY COMMISSIONERS; HAMILTON COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES; MOIRA WEIR; ERIC YOUNG; RACHEL BUTLER; CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER; JENNIFER BOWDEN, M.D.; KIMBERLEY STEPHENS, LISW; ANKITA ZUTSHI, M.D.; DANIEL ALMEIDA, M.D.; SUZANNE SAMPANG, M.D.; LAUREN HEENEY,

     *Defendants-Appellees*.

No. 18-4179

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:17-cv-00511—Timothy S. Black, District Judge.

Argued:  June 27, 2019

Decided and Filed:  March 3, 2020

Before:  SILER, BATCHELDER, and DONALD, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:**  Ted L. Wills, Cincinnati, Ohio, for Appellants.  Andrea B. Neuwirth, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Hamilton County Appellees.  Jason R. Goldschmidt, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Cincinnati Children's Hospital Appellees.  **ON BRIEF:**  Ted L. Wills, Cincinnati, Ohio, for Appellants.  Andrea B. Neuwirth, Jerome A. Kunkel, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Hamilton County Appellees.  Jason R. Goldschmidt, J. David Brittingham, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Cincinnati Children's Hospital Appellees.

  SILER, J., delivered the opinion of the court in which BATCHELDER, J., joined, and DONALD, J., joined in part.  DONALD, J. (pp. 19–20), delivered a separate opinion dissenting in part.

No. 18-4179          *Siefert, et al. v. Hamilton Cty. Bd. of Comm'rs, et al.*          Page 2

———————————

**OPINION**

———————————

SILER, Circuit Judge.   When Joseph and Melissa Siefert's child started experiencing suicidal thoughts, anxiety, and depression, they sought help.   After first trying medication, they took their teenage child—known here as "Minor Siefert"—to Children's Hospital just outside of Cincinnati.   Eventually, Minor Siefert ended up at a Children's psychiatry facility, and after about a week, the Sieferts' insurance company determined that Minor Siefert had no medical problems, so it denied further coverage.

Coverage terminated, the Sieferts decided to bring their child home.   But they ran into a problem: doctors and social workers had none of it.   Over the next four weeks, the Sieferts wrangled with the hospital and county about getting their child back.   Only after the Sieferts signed a voluntary safety plan did the child leave the facility.   The Sieferts sued the county and its employees, as well as the hospital and its doctors, alleging a violation of the Fourteenth Amendment Due Process Clause's procedural and substantive components.   The district court dismissed the hospital defendants because they were not state actors, and it dismissed the county defendants because it said the Sieferts failed to overcome qualified immunity.

But "[e]ven a temporary deprivation of physical custody requires a hearing within a reasonable time." *Eidson v. Tenn. Dept. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007). And at litigation's starting line, the Sieferts only had to plausibly allege a due process violation and that the hospital may be considered a state actor for purposes of this litigation.   Today we decide only these narrow questions, and we side with the Sieferts on some and the defendants on others.   Whether Defendants ultimately prevail on all claims—at summary judgment or at trial— is best left for another day.   We affirm in part, reverse in part, and remand.

I.

We take the facts only from the complaint, accepting them as true as we must do in reviewing a Rule 12(b)(6) motion. Fed. R. Civ. P. 12(b)(6). The Sieferts have five children, one of whom is the center of this case.   Minor Siefert was born a girl but identifies now as a

transgender boy.  Minor Siefert began taking medication and going through therapy in November 2015 after reporting problems with depression, anxiety, and suicidal thoughts.  After telling his parents about his transgender identity, Minor Siefert emailed Hamilton County Job and Family Services claiming his parents were not supportive and that their conduct amounted to abuse.

That is when county officials stepped in.  Rachel Butler, a Job and Family Services employee, came to the Sieferts' home to talk on the same day of Minor Siefert's email.  Three days later, acting at the behest of their pediatrician, the Sieferts took their child to Children's Hospital in Liberty Township, Ohio.  The next day, Minor Siefert was sent to the Children's College Hill psychiatry facility where the Sieferts consulted with Job and Family Services employees about Minor Siefert's treatment.

During a meeting with the Sieferts, Butler explained that Children's would not send Minor Siefert home without Job and Family Services's approval.  And that would not occur, Butler told the Sieferts, until social workers were satisfied they found the right place for Minor Siefert to go.  After a week or so, Children's employees arranged a new discharge meeting for November 22, 2016.  During that meeting, Kimberly Stephens, a Children's employee, told the Sieferts that nothing could be done at that time because Butler did not attend the meeting. Stephens said they would have to reschedule and told the Sieferts to leave.

That same day, Dr. Ankita Zutshi presented Minor Siefert's case to a doctor with Humana Behavioral Health, which was covering Minor Siefert's treatment.  The Humana board-certified psychiatrist concluded that Minor Siefert had "no acute symptoms that require 24 hour care," and that Minor Siefert was not a danger to himself or others, was not aggressive, was medically stable and was not manic.  So, Humana denied additional coverage.

The next day, Mr. Siefert began calling Children's staff members and leaving voice messages to "exercise his parental right to custody and association with Minor Siefert."  During this time, Job and Family Services was actively pursuing the case, but did not attempt to obtain a court order for custody or provide the Sieferts with a hearing.  In his calls to Children's employees, Mr. Siefert sought "to have Minor Siefert discharged from Children's to the parents." Mr. Siefert also called Butler, and two of her supervisors at Job and Family Services, in an

attempt to have his child discharged, but no one returned his calls.  At the same time, Dr. Zutshi ordered that Minor Siefert was "not to be discharged AMA [against medical advice] on request of parents."

All the while, Butler and Stephens had their own telephone calls.  Butler told Stephens that the "parents could not take [Minor Siefert] back home."  Then, Stephens spoke with Mr. Siefert by phone.  And when Mr. Siefert told Stephens he wanted Minor Siefert discharged, Stephens said the child could not go home and that Mr. Siefert would have to contact Job and Family Services to get Minor Siefert out of the hospital.  During this same time, Dr. Daniel Almeida (at Children's) wrote that "JFS gave clear recommendations to not allow patient to be discharged to parents."

Then came the November 28 meeting.  It included Mr. and Mrs. Siefert and Stephens; Butler participated by telephone.  When Mr. Siefert asked how to get his child discharged, Butler responded, "It does not work that way," and that when the Sieferts cannot care for their child the county must "step in."  Butler hung up the phone a short while later, and the Sieferts "demanded to Ms. Stephens that Minor Siefert be discharged."  But when Mr. Siefert said he could go down the hall and take the child home, Stephens responded that the Sieferts were not allowed to do so.  At that point, Lauren Heeney, with Children's, joined the meeting and told the Sieferts that they could not even visit their child.

Unsatisfied with the meeting, Mr. Siefert decided to email Hamilton County Administrator Jeff Aluotto the next day.  This led to another meeting—this time at the Job and Family Services building in Cincinnati; Butler, the Sieferts and Eric Young (with Job and Family Services) attended.  Young explained that Job and Family Services had to investigate and would prevent parents from having custody or association with their child when doctors or social workers did not approve the child's release.  Young put it succinctly: "we have to go by what the doctors say."

And the doctors had made it clear.  Dr. Almeida ordered that Minor Siefert should not be discharged on the Sieferts' request and that if Mr. and Mrs. Siefert came around "security also needs to be called."  More than a week later, Minor Siefert remained hospitalized, and county

representatives Young and Butler told Stephens of Children's that the child "could not go home." Dr. Jennifer Bowden ordered on December 9 that Children's staff continue "collaboration with JFS" to deny the Sieferts custody and association with Minor Siefert.  Three days later, Stephens told the Sieferts that "JFS holds the key in determining where [the] patient goes at this time."

Finally, Minor Siefert left Children's on December 20, 2016—nearly a month after entering.  The release occurred after the county and the Sieferts entered a voluntary safety plan requiring Minor Siefert to stay with his grandparents.  The Sieferts filed this lawsuit under 42 U.S.C. § 1983, alleging that the county, Children's, and their employees violated the Sieferts' procedural and substantive due process rights under the Fourteenth Amendment.  The district court dismissed the case on a Rule 12(b)(6) motion to dismiss.  This appeal followed.

## II.

Our review of a 12(b)(6) dismissal includes no deference to the district court.  *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).  This de novo review puts us in the same position as the lower court and requires us to examine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausible allegations exist "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The factual allegations need not be overly detailed, but nor can they merely recite the elements of a cause of action and make a "the-defendant-did-it" allegation.  *See id.*

## III.

Defendants fall into two categories: (1) the county defendants, and (2) the hospital defendants.  The former argue that qualified immunity blocks this suit, and the hospital employees say that constitutional claims do not apply to them because they are not state actors. We begin with state action.

***State Action and Hospital Defendants.***  The Fourteenth Amendment, like most of the Constitution, places limits on government behavior and has little to say about what private

parties must do.  *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 923-24 (1982).  After all, "the Due Process Clause protects individuals only from governmental and not from private action," *id.* at 930, "no matter how unfair that conduct may be." *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988).  But, like many things in law, this principle comes with exceptions.  Sometimes, non-government actors must comply with constitutional commands.  *See Lugar*, 457 U.S. at 937.

When does this occur?  Courts have highlighted several "tests," but it all comes down to "whether 'there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'"  *Brent v. Wayne Cty. Dept. of Human Servs.*, 901 F.3d 656, 676 (6th Cir. 2018) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

The district court held that no such relationship existed here because (1) Children's was "simply performing medical treatment and complying with Ohio reporting statutes," and (2) Children's had no contract with the state, did not perform a state function, and the state did not approve Children's policies in advance.

But Children's did far more than what the district court acknowledged.  According to the complaint, which we take as true, Children's and Hamilton County worked in tandem.  Often collaborating and communicating about Minor Siefert's situation, they depended on each other to block Minor Siefert's release.  Children's admitted it needed the county's permission to send Minor Siefert home.  Meetings at Children's often included the Sieferts, Children's employees, and county officials together.  Children's employees told the Sieferts they could not discharge Minor Siefert without talking to Hamilton County employees.  Indeed, when the Sieferts demanded that Children's discharge Minor Siefert, Stephens (of Children's) "told Mr. Siefert that he would have to contact HCJFS to attempt to obtain Minor Siefert's discharge," because discharge "was being blocked by JFS."  County defendants had, according to the complaint, "told Ms. Stephens that Minor Siefert 'could not go home.'"  Stephens relayed that message to the Sieferts, telling them "JFS holds the key in determining where patient goes."  And in his notes, Dr. Almeida wrote that Children's could not release Minor Siefert because "JFS gave clear recommendations to not allow patient to be discharged to parents."

No. 18-4179        *Siefert, et al. v. Hamilton Cty. Bd. of Comm'rs, et al.*        Page 7

What is more, county employees told the Sieferts they had to "go by what the doctors say." The doctors had said "that Minor Siefert was not to be discharged 'on request of parents,'" but the county had told the hospital that the "parents could not take [Minor Siefert] home." And both county and Children's employees agreed to discuss placing Minor Siefert in a foster home.

These facts plausibly establish Children's state-actor status because the conduct was "fairly attributable to the state." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). This "close nexus" developed as Children's and the county remained in constant contact, relied on each other for keeping Minor Siefert at the hospital, and at various times gave the Sieferts conflicting statements about who would make the ultimate decision to discharge Minor Siefert. In telling Children's it could not discharge Minor Siefert without its consent, county defendants also gave "significant encouragement, either overt or covert" to Children's actions. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Plus, Children's cooperation with Hamilton County shows it was a "willful participant in joint activity with the State or its agents." *Brentwood Acad.*, 531 U.S. at 296 (quoting *Lugar*, 457 U.S. at 941).

It is of course true "that the mere fact that a hospital is licensed by the state is insufficient to transform it into a state actor." *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). And the district court was correct that hospitals and doctors do not become state actors merely because they comply with state statutes. *See Ellison v. Garbarino*, 48 F.3d 192, 195-96 (6th Cir. 1995). So if that were all Children's had done—or all the Sieferts had alleged in their Complaint—then Children's could prevail at the 12(b)(6) stage. But the Sieferts present specific factual allegations, detailing a deep and symbiotic relationship between Children's and the county. From the Sieferts' perspective, it would have been hard to know who could discharge Minor Siefert—Hamilton County or Children's. And when the distinction between the state and private party breaks down to that degree, a private party becomes a state actor in § 1983 cases. *See Brentwood Acad.*, 531 U.S. at 296-97.

All this means today is that the Sieferts have alleged enough facts to keep Children's in this lawsuit. *Iqbal*, 556 U.S. at 678. But a "plaintiff['s] ability to survive a motion to dismiss with respect to the state-actor question does not necessarily mean that they could survive summary judgment." *Brent*, 901 F.3d at 677. The Sieferts have unlocked the door to discovery,

not to liability. And in the end, Children's may show that it was not a state actor. But at this point, it is too soon to know.

We **REVERSE** the district court's holding that the Sieferts failed to plausibly allege that Children's and its employees were state actors.

***Constitutional Violations and Qualified Immunity***. Qualified immunity, pleading requirements, and Rule 12(b)(6) have a complicated relationship. At times, we have said that courts should refrain from using qualified immunity at the motion-to-dismiss stage. *See Wesley*, 779 F.3d at 433. After all, qualified immunity is an affirmative defense, not an element of a cause of action. *See Crawford-El v. Britton*, 523 U.S. 574, 586-87 (1998). And Federal Rule of Civil Procedure 8(a) requires only that a plaintiff *state* a claim, not that a plaintiff show that he can overcome an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 212 (2007); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

We have also said that the fact-intensive nature of qualified immunity makes it often a bad fit for Rule 12(b)(6). *See Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019). That's because, at this point in the case, "the precise factual basis for the plaintiff's claim or claims may be hard to identify," meaning "the court's task can be difficult." *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 238-39 (2009)). Without more than the complaint to go on, the court "cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent," making qualified immunity inappropriate. *Guertin*, 912 F.3d at 917 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)). So one might say that "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal." *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring); *see also Reed v. Palmer*, 906 F.3d 540, 548-49 (7th Cir. 2018) (explaining that qualified immunity usually will rarely be the basis for a 12(b)(6) dismissal); *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (same). Like in our sister circuits, here it is "generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Wesley*, 779 F.3d at 433).

But this is only a "general preference," not an absolute one.  *Guertin*, 912 F.3d at 917.
Defendants may raise the qualified immunity defense in response to a 12(b)(6) motion because it
is "an immunity from suit rather than a mere defense to liability."  *Pearson*, 555 U.S. at 231
(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  That is why some claims must "be
resolved *prior to discovery*."  *Id.* at 231-32 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640
n.2 (1987) (emphasis added)).

Thus, despite the general preference to save qualified immunity for summary judgment,
sometimes it's best resolved in a motion to dismiss.  This happens when the *complaint*
establishes the defense.  *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016); *see also*
*Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).  So we ask whether the complaint plausibly
alleges "that an official's acts violated the plaintiff's clearly established constitutional right."
*Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011).  If, taking all the facts as
true and reading all inferences in the plaintiff's favor, the plaintiff has not plausibly showed a
violation of his clearly established rights, then the officer-defendant is entitled to immunity from
suit.  *See Pearson*, 555 U.S. at 232.

***Procedural Due Process***.  States cannot "deprive any person of life, liberty, or property,
without due process of law."  U.S. Const. amend. XIV.  To sue under this clause, the Sieferts
must have a liberty or property interest that triggers the process requirement, and then they must
show they received insufficient process.

The Sieferts argue that Defendants infringed on their rights to the care, custody, and
control of Minor Siefert.  And, the Sieferts claim, the Defendants did so without providing any
process.  That runs afoul of the Due Process Clause, the Sieferts claim, because the parent-child
relationship enjoys deep and broad protections—and they got none.

When it comes to parents and their children, courts are in unison: the "relation gives rise
to a liberty interest that a parent may not be deprived of absent due process of law."  *Kottmyer*,
436 F.3d at 689.  The Supreme Court has called parents' "care, custody, and control of their
children . . . perhaps the oldest of the fundamental liberty interests recognized by this Court."
*Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).  This right is "far more precious

than [any] property right[]." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 38 (1981) (Blackmun, J., dissenting) (editing mark omitted) (quoting *May v. Anderson*, 345 U.S. 528, 533 (1953)). "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Procedural safeguards also apply when the state engages in a "temporary deprivation of physical custody" of a child. *Eidson.*, 510 F.3d at 635.

But these rights are not absolute.  They are "limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Kottmyer*, 436 F.3d at 690.  That's because states "have a 'traditional and transcendent interest' in protecting children within their jurisdiction from abuse." *Id.* (quoting *Maryland v. Craig*, 497 U.S. 836, 855 (1990)).

Defendants argue that their interest in protecting Minor Siefert outweighs procedural protections the Sieferts would otherwise receive.  They claim that the Sieferts' situation did not spark procedural requirements because (1) Defendants were investigating possible abuse, (2) Defendants never took legal custody of Minor Siefert, (3) the Sieferts voluntarily consented to hospitalization, and (4) the Sieferts never physically tried to remove their child.  And, at the very least, Defendants argue, the Sieferts' due process rights were not clearly established, so qualified immunity blocks this lawsuit.

These consent-and-abuse-investigation rationales, however, clash with the procedural posture of the case.  Yes, consent extinguishes constitutional procedural safeguards. *See Smith v. Williams-Ash (Williams-Ash II)*, 520 F.3d 596, 600 (6th Cir. 2008).  That is because "hearings are required for deprivations taken over objection, not for steps authorized for consent." *Id.* (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761-62 (7th Cir. 2006)).  And, yes, factual development might ultimately show that the Sieferts consented to Minor Siefert's hospitalization. But now is not a time for examining competing facts—it is a time for accepting the complaint's facts as true and drawing all reasonable inferences in the plaintiffs' favor.  Doing so does not establish the Sieferts' consent.

The complaint says that the Sieferts made numerous attempts to remove Minor Siefert from the hospital: voicemail messages, emails, and direct statements to hospital and county employees.  Plus, several paragraphs describe how Defendants told the Sieferts that their child could not go home.  A reasonable inference in the Sieferts' favor is that Defendants continued to explain that Minor Siefert could not go home because the parents *wanted* their child home.  The district court's recognition that the Sieferts "did not allege . . . that they made written demands for [Minor Siefert's] release," does not establish consent.  The Sieferts did not have to so plead because showing a lack of consent is not an element of the claim.  Instead, whether the Sieferts consented is a fact-based question reserved for summary judgment or later in the case.

Nor does *Williams-Ash II* help Defendants.  *See* 520 F.3d at 600.  There, Hamilton County Job and Family Services removed the plaintiffs' children from the home without a hearing.  *Id.* at 597-98.  We held that the parents had consented because they entered a voluntary safety plan, so the parents were due no process.  *Id*. at 600.  But that decision occurred *at summary judgment*. *Id.* at 599.  And, in fact, when the case had previously come before us at the motion-to-dismiss stage, we focused solely on the complaint in holding that the plaintiffs had adequately pleaded a procedural due process violation because "plaintiffs were not allowed to recover their children after the Safety Plan had been initiated despite their best efforts to do so." *Smith v. Williams-Ash (Williams-Ash I)*, 173 F. App'x 363, 366 (6th Cir. 2005) (per curiam).  The defendants argued that the Safety Plan showed the plaintiffs' consent, but we held that "*the complaint* alleges that the continued deprivation of the [plaintiffs'] children was involuntary, and that they were effectively denied a prompt hearing." *Id.* (emphasis added).  Only *after* factual development did it become clear—in *Williams-Ash II*—that plaintiffs had consented, and defendants were entitled to summary judgment.  *See Williams-Ash II*, 520 F.3d at 599-600.

Here, too, the district court should have judged the *complaint only*. *Id.*  Just as in *Williams-Ash II*, consent may become clear at summary judgment.  But reading the complaint's facts in the light favorable to the Sieferts, we can draw a reasonable inference that the Sieferts did not consent, given the number of times they allege they demanded that Minor Siefert be discharged.

No. 18-4179        *Siefert, et al. v. Hamilton Cty. Bd. of Comm'rs, et al.*        Page 12

A similar complaint-focused analysis impedes Defendants' abuse investigation argument. Although, "[m]ere investigation by authorities into child abuse allegations without more . . . does not infringe upon a parent's right to custody or control of a child," *Kottmyer*, 436 F.3d at 691, the Sieferts' complaint does not allege "[m]ere investigation . . . without more." *Id.*  Indeed, the complaint makes a single reference to abuse: Minor Siefert "alleged that [Mr. and Mrs. Siefert] were not supportive and that their conduct towards her amounted to abuse."  And then the complaint alleges more—specifically that Defendants refused to discharge Minor Siefert for nearly a month while the Sieferts sought to have access to their child.  This is in stark contrast to *Kottmyer*, where the plaintiffs only allegation was that the defendants "initiated an investigation" into abuse allegations.  *Id.*  In that case there was "no allegation that [the child] was removed from her parents'[] custody, either temporarily or permanently, or that the [defendant] or Hamilton County in any way interfered with the Kottmyers'[] right to custody, control and companionship of their daughter."  *Id.  Kottmyer* teaches that an abuse investigation, *standing alone*, does not interfere with parental rights in a way that requires due process.  *Id.*  But if the parents were not "permitted to remove [their child] from the hospital until [defendants] allowed" that could "in some circumstances . . . interfere with parental custody of a child."  *Id.* at 691 n.2. That is this case: The Sieferts took Minor Siefert to the hospital but later demanded discharge. Thus, reading the complaint in the light most favorable to the Sieferts, they have alleged a plausible claim that Defendants interfered with their parental rights and they received no process.

Even so, could this all be "clearly established" to get around qualified immunity?  This standard extends broadly to "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  A plaintiff can clear this high hurdle only when every reasonable official would know his conduct was unlawful as established by "'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Id.* at 589-90 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)).  And the unlawfulness must be obvious "in the particular circumstances before" the official.  *Id.* at 590.  General statements of the law and abstract rules fail to provide the high-level of specificity necessary to create clearly established law.  *Id.*

So it must be clear that Defendants' actions in this particular circumstance—as alleged in the complaint—violated the Sieferts' due process rights. Plausibly, they did. In case after case, the Supreme Court has emphasized the parent-child relationship's special place in our society. *See, e.g.*, *Troxel*, 530 U.S. at 65-66 (collecting cases). The right's importance means that "[e]ven a temporary deprivation of physical custody requires a hearing within a reasonable time." *Eidson*, 510 F.3d at 635. A hearing is necessary when "a child's removal is . . . sustained over the parent's objections." *Young v. Vega*, 574 F. App'x 684, 691 n.6 (6th Cir. 2014). And when state officials do not allow parents to remove a child from the hospital until the defendants say so, that can "be construed to interfere with parental custody of a child." *Kottmyer*, 436 F.3d at 691 n.2; *see also Williams-Ash II*, 520 F.3d at 600-01 (concluding if a parent revokes consent to a safety plan, the state must provide due process); *Kottmyer*, 436 F.3d at at 691 ("[P]arents will not be separated from their children without due process of law except in emergencies." (quoting *Mabe v. San Bernardino Cty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001)); *Williams-Ash I*, 173 F. App'x at 366 (explaining "a temporary deprivation of physical custody requires a hearing within a reasonable time"); *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir. 1983) (noting "it is axiomatic that a parent has a liberty interest in the freedom of personal choice in matters of family life in which the state cannot interfere"). Out-of-circuit cases—so-called "persuasive authority"—reinforce the point. *See, e.g.*, *Keates*, 883 F.3d at 1238-39 (holding parent plausibly pled constitutional violation where social worker held a parent's daughter at the hospital and did not allow mother to take the child home); *Phifer v. City of New York*, 289 F.3d 49, 61 (2d Cir. 2002) ("[W]here a parent voluntarily grants temporary custody to the government or a third party, which then refuses to release the child, 'the State has the duty to initiate a prompt post-deprivation hearing after the child has been removed from the custody of his or her parents.'" (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 760 (2d Cir. 2000))).

In short, when Minor Siefert was hospitalized, "existing precedent . . . placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. At least, that is, according to the *complaint*. Defendants argue that the Sieferts cannot overcome qualified immunity because no case says that parents deserve due process when they voluntarily hospitalize their child, the state investigates allegations of abuse, and the parents consent to the ongoing hospitalization. But characterizing the case this way puts the cart before the horse. The *complaint* does not

establish the depth of abuse allegations or that the Sieferts consented to Minor Siefert's ongoing hospitalization. The complaint says the Sieferts routinely demanded that Minor Siefert be discharged. And the complaint alleges that the Sieferts' insurance company had a psychiatrist determine that Minor Siefert was no harm to anyone and was medically stable.

We **REVERSE** the district court's holding that the Sieferts failed to adequately plead a violation of their procedural due process rights.

***Substantive Due Process.*** We cannot say the same regarding the Sieferts' substantive due process claim. Under this doctrine, the government may not deprive individuals of certain rights, regardless of the procedures used. *Guertin*, 912 F.3d at 918. Sometimes, this court has said that this component of the Fourteenth Amendment comes in two varieties: "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Pittman v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)). And other times, the court has suggested both prongs are required. *See Am. Express Travel Related Servs. Co., Inc. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011); *see also Guertin*, 912 F.3d at 922.

Most recently, however, we have held that when we review a substantive due process claim, we first ask whether the plaintiff has shown "a deprivation of a constitutionally protected liberty interest" and then ask whether "the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Id.* (citing *Am. Express Travel Related Servs. Co.*, 641 F.3d at 688). "Thus, a plaintiff must show as a predicate the deprivation of a liberty or property interest," as well as "conscience-shocking conduct." *Id.*

The Sieferts adequately allege that they were deprived of the "fundamental liberty interest in the care, custody, control, companionship, and management of [Minor Siefert.]" The question therefore—not addressed by the district court—is whether the Sieferts adequately pleaded that the Defendants engaged in conscience-shocking behavior. Otherwise, they have failed to state a substantive due process claim.

What counts as "conscience shocking" is not always so clear. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) ("[T]he measure of what is conscience shocking is no

calibrated yard stick."). But "abuse of power" serves as the North Star in the analysis. *Guertin*, 912 F.3d at 923. We view the behavior "on a spectrum," with negligence on one end, and intentional harm on the other. *Id.* Those cases are easy: negligent behavior fails to shock the conscience, but intentional harm does. *Id.* "[I]n the middle," there is "something more than negligence but less than intentional conduct, such as recklessness or gross negligence," which presents more difficult cases. *Id.* (quoting *Lewis*, 523 U.S. at 849). But always, courts should "prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees," *id.*, because "the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States," *Lewis*, 523 U.S. at 848 (quotation marks omitted).

The Sieferts never argue that Defendants intended to inflict harm. And the complaint alleges nothing of the sort. Thus, the Sieferts can prevail only by showing that Defendants acted with deliberate indifference under the more-than-negligence-but-less-than-intentional standard. And context informs whether such a claim shocks the conscience. *Guertin*, 912 F.3d at 923. That's because the court's "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.

We must consider "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Guertin*, 912 F.3d at 924 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). Deliberation time alone does not always mean actions rise to the conscience-shocking level. *Id.* It is one factor in a "focus . . . upon the entirety of the situation—'the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent.'" *Id.* (quoting *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014)). Consideration of both the "nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act," also helps courts decide whether the official's act amounted to deliberate indifference. *Id.* Indeed, a defendant's action in support of legitimate governmental purpose will often not lay the

groundwork for a substantive due process claim even if the defendant acted "despite a subjective awareness of substantial risk of serious injury." *Id.*

The Sieferts' allegations do not rise to the "high" bar of deliberately indifferent, conscience-shocking behavior. *Range*, 763 F.3d at 589. First, the Sieferts never allege in their complaint that the Defendants acted without any governmental purpose. And courts have long recognized a "compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Kottmyer*, 436 F.3d at 690. The Sieferts do say that Defendants had nearly a month to deliberate, but they do not allege that during that time the Defendants acted with indifference toward the Sieferts' fundamental liberty interest in family integrity. *Guertin*, 912 F.3d at 926. "Deliberate indifference in the constitutional sense requires that the officials *knew* of facts from which they could infer a 'substantial risk of serious harm,' that they *did* infer it, and that they acted with indifference 'toward the individual's rights.'" *Range*, 763 F.3d at 591 (emphases added). Hence, the Sieferts' complaint alleges that the defendants acted with only a "subjective recklessness" toward a "substantial risk of serious injury." *Guertin*, 912 F.3d at 926.

The Sieferts moreover fail to allege that the Defendants acted with deliberately indifferent conduct that shocks the conscience. Again, the relevant inquiry is "whether [a] government actor was pursuing a legitimate governmental purpose[,]" *Range*, 763 F.3d at 590, and whether that interest outweighed the deprivation of the parental liberty interest in this instance. *See Kottmeyer*, 436 F.3d at 690 ("The [fundamental liberty interest in family integrity] is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents."). Based on the facts as alleged in the complaint, these Defendants were between a rock and a hard place: they could either ensure that the parents were not deprived of their fundamental liberty interest and risk failing to protect the child if the allegations of abuse were legitimate, or they could ensure that the minor child was protected from alleged abuse and risk depriving the parents of their liberty interest. Even if we disagree with the choice the Defendants made, we cannot say that when faced with that choice, the Defendants' opting to err on the side of protecting the child at the expense of depriving the parents of their parental rights for a period of a month is conduct

that shocks the conscience. Thus, the complaint fails to establish behavior that shocks the conscience, so we **AFFIRM** the district court's holding that the Sieferts failed to state a claim under substantive due process.

**Monell *Claims***. The Sieferts' claims against the county entities must fail under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The Sieferts point to no official policy or custom by the county, and they fail to show the county ratified any unconstitutional behavior. *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Nor do the Sieferts allege facts that the county failed to train or was deliberately indifferent. *Id.* Under the failure-to-train theory, the Sieferts had to plead "(1) a clear and persistent pattern of illegal activity, (2) which the [county] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [county's] custom was the cause of the deprivation of [the Sieferts'] constitutional rights." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016). The Sieferts allege none of that, and so their *Monell* claims fail.

***Conspiracy Claims***. A § 1983 civil conspiracy claim requires "(1) a 'single plan' existed, (2) [defendants] 'shared in the general conspiratorial objective' to deprive [plaintiffs] of [their] constitutional . . . rights, and (3) 'an overt act was committed in furtherance of the conspiracy that caused injury' to [plaintiffs]." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). But there are no facts in the complaint alleging that any such agreement existed. And no facts suggest that the parties had an objective to deprive the Sieferts of their constitutional rights. *Id.* Yes, county employees and doctors from Children's worked together, but nowhere do the Sieferts allege that the Defendants agreed to do anything—let alone agreed to violate constitutional rights. *Id.* Even if the Sieferts make a plausible procedural due process claim, there are no factual allegations that the parties "agreed to the general conspiratorial objective of violating [the Sieferts'] constitutional rights." *Id.* at 603. And "it is well-settled that conspiracy claims must be pled with some degree of specificity." *Heyne*, 655 F.3d at 563 (editing mark omitted). None is alleged here.

The same is true of the state law conspiracy claim, which requires "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*,

No. 18-4179       *Siefert, et al. v. Hamilton Cty. Bd. of Comm'rs, et al.*       Page 18

650 N.E.2d 863, 866 (Ohio 1995) (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987)).  A combination is "malicious" only if one acts with a "state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another."  *Chesher v. Neyer*, 477 F.3d 784, 805 (6th Cir. 2007) (quoting *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)).  As in the federal claims, there are no specific factual allegations suggesting that the Defendants ever entered into an agreement—let alone one with malicious intent.  So, the Sieferts fail to plausibly allege civil conspiracy under state law.

## IV.

State intervention in family life—even if for a short period—typically requires due process of law.  Of course, sometimes the state need not provide process, such as when parents give consent.  That may be this case.  But at the pleading stage, the Sieferts are entitled to all reasonable inferences.  That goes for their claim that the Children's defendants are state actors, too.  So this case should continue on procedural due process grounds, and "the district court can consider both the state actor and § 1983 issues at summary judgment."  *Brent*, 901 F.3d at 678.  We **AFFIRM** in part, **REVERSE** in part, and **REMAND**.

No. 18-4179          *Siefert, et al. v. Hamilton Cty. Bd. of Comm'rs, et al.*          Page 19

---

### DISSENTING IN PART

---

BERNICE BOUIE DONALD, Circuit Judge, dissenting in part.  While I agree with most of the majority's analysis, I would reverse the district court's holding that the Sieferts failed to state a claim under substantive due process.

As the majority points out, there are two categories of substantive due process claims: those alleging a "deprivation of a particular constitutional guarantee" and those alleging actions that "shock the conscience."  Op. at 16 (citing *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011)).  In *Pittman*, however, we clarified that we apply different standards to those two types of claims.  *Id.*  Where the plaintiff *does not* assert the deprivation of a particular constitutional guarantee, we review the claim under the shock the conscience standard.  *Id.* at 728 n.6.  In contrast, where a plaintiff *does* assert a deprivation of a particular constitutional guarantee—such as that alleged here, deprivation of familial association—we analyze whether "the [challenged] action [was] necessary and animated by a compelling purpose."  *Id.* at 728-29 (quoting *Bartell v. Lohiser*, 215 F.3d 550, 557-58 (6th Cir. 2000)).

I believe the district court correctly determined that the Sieferts premise their substantive due process claim on the deprivation of their right to familial association.  *See* Appellant's Br. at 24 ("HCJFS and Children's continued to prohibit the Sieferts from custody and association with Minor Siefert."); *Id.* at 23 ("Ms. Heeney, accordingly, prohibited the Sieferts from obtaining custody and association with Minor Siefert."); *Id.* at 33 ("In this case, the Sieferts have already established that the Sieferts suffered a deprivation of a constitutional right based on the denial of their liberty interest in family integrity.").  Because the Sieferts' claim is based on the deprivation of their right to familial association, I believe we must analyze it under the standard applicable to particular-constitutional-guarantee claims.  That the Sieferts argue an erroneous legal standard in their briefing does not mean that this Court should not analyze their claim under the correct one.

The Sieferts allege that the defendants interfered with their right to associate with their child for over four weeks. Under the particular-constitutional-guarantee standard, we have suggested that similar conduct could constitute a substantive due process violation. *See e.g.*, *Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006) (suggesting that an "allegation that [a child] was removed from her parents's [sic] custody, either temporarily or permanently, or that the [the government] in any way interfered with the [parents'] right to custody, control and companionship of their [child]" could constitute a violation of the parents' right to familial association (footnote omitted)). Therefore, contrary to the majority, I would reverse the district court with respect to this claim as well.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 18-4179

JOSEPH SIEFERT; MELISSA SIEFERT,

    Plaintiffs - Appellants,

      v.

HAMILTON COUNTY; BOARD OF HAMILTON
COUNTY COMMISSIONERS; HAMILTON COUNTY
DEPARTMENT OF JOB AND FAMILY SERVICES;
MOIRA WEIR; ERIC YOUNG; RACHEL BUTLER;
CINCINNATI CHILDREN'S HOSPITAL MEDICAL
CENTER; JENNIFER BOWDEN, M.D.; KIMBERLEY
STEPHENS, LISW; ANKITA ZUTSHI, M.D.; DANIEL
ALMEIDA, M.D.; SUZANNE SAMPANG, M.D.; LAUREN
HEENEY,

    Defendants - Appellees.

```
┌─────────────────────────────┐
│          FILED              │
│       Mar 03, 2020          │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before: SILER, BATCHELDER, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk