**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

JOSEPH SIEFERT, *et al.*,

    *Plaintiffs*,

v.

HAMILTON COUNTY BOARD OF
COMMISSIONERS, *et al.*,

    *Defendants*.

Case No. 1:17-cv-511

Judge Jeffery P. Hopkins

---

## OPINION AND ORDER

---

When a fifteen-year-old girl emailed child protective services with a distressing message concerning the treatment she was allegedly receiving from her parents, an investigation ensued. Shortly after sending the email, Joseph and Melissa Siefert ("the Sieferts" or "Plaintiffs"), parents of the teenager, admitted their daughter to Defendant Cincinnati Children's Hospital Medical Center[1] ("Children's" or "Children's Hospital"), even so, Defendant Hamilton County Department of Job and Family Services[2] ("the County" or

---

[1] During the period covered by the Complaint, Defendants Daniel Almeida, M.D., Jennifer Bowden, M.D., Kimberley Stephens, LISW, Ankita Zutshi, M.D., Suzanne Sampang, M.D., and Lauren Heeney were employed by Children's Hospital. They have been sued in their individual and official capacities, along with Children's Hospital in an official capacity, for allegedly depriving Plaintiffs of their due process rights. Compl., Doc. 1.

[2] Hamilton County, the Hamilton County Board of Commissioners, and the Hamilton County Department of Job and Family Services constitute a single entity and hereinafter are referred to collectively as "the County" or "JFS." Defendants Moira Weir, Eric Young, and Rachael Butler (misspelled as "Rachel" in Plaintiffs' Complaint, *See* Doc. 120, PageID 6074, n.1) were employees of the County or JFS. Each of these employees have been sued by Plaintiffs in their individual and official capacities based on their alleged deprivation of Plaintiffs' due process rights. Compl., Doc. 1. The County has also been sued in its official capacity. *Id.* However, on appeal, Plaintiffs, among other things, could "point to no official policy or custom by the county . . . [or] show the county ratified any unconstitutional behavior" to create entity liability. *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 767 (6th Cir. 2020). With that, the claims against the County failed. *Id.* However, the remaining claims against the named individual Defendants employed by JFS survived. These claims are now ripe for adjudication.

"JFS") ("Children's" or "Children's Hospital" and "the County" or "JFS" referred to collectively as "Defendants") continued its investigation of alleged abuse by the Sieferts. The reason the Sieferts took their daughter to Children's Hospital was because she began to express suicidal ideations and to show signs of depression stemming from a medical condition called gender dysphoria. Doc. 117-16, PageID 5732. About a week after the Sieferts' daughter was admitted at Children's Hospital, her medical insurance coverage ran out. Doc. 130, Page ID 6888. The Sieferts then sought to have their daughter discharged from the hospital, however, those requests went unmet. The Sieferts did not receive a hearing or any other type of procedural safeguard before Defendants made the decision to retain their daughter at the hospital. Instead, Plaintiffs' requests to have their child discharged were met with refusals—for nearly a month—by the staff at both JFS and Children's Hospital. Doc. 113, PageID 3336.

These events have given rise to nearly a decade of litigation and appeals between these three groups—JFS, Children's Hospital, and the Sieferts, culminating in the case now before this Court. The issues presented represent a familiar tension between "perhaps the oldest of the fundamental liberties": the constitutional right to raise a child balanced with the "governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). In this case, the Court seeks to strike a proper balance between these two important and occasionally competing interests.

## I.    PROCEDURAL HISTORY

On August 1, 2017, Plaintiffs filed suit against Defendants asserting, among other claims, due process violations under the Fourteenth Amendment. U.S. Const. amend. XIV, § 1. Compl., Doc. 1, ¶ 3. Defendants moved to dismiss or alternatively to stay the proceedings

(Docs. 12, 13) asserting that the Children's Defendants were not state actors, which prevented Plaintiffs from bringing constitutional claims against them, and the County Defendants asserted that qualified immunity blocked any suit that could be brought. Doc. 13, PageID 97; Doc. 12, PageID 83–84. After full briefing on the motions, this Court granted the County's motion to stay the proceedings and granted Children's Hospital's motion to dismiss.[3] Doc. 32.

Plaintiffs appealed that decision. On appeal, the claims against the County in its official capacity failed because Plaintiffs could not, among other things, "point to [any] official policy or custom by the county, and . . . fail[ed] to show the county ratified any unconstitutional behavior." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 767 (6th Cir. 2020). On its order of remand, the Sixth Circuit directed this Court to reconsider the state action and qualified immunity defenses asserted by the remaining Defendants: (1) Children's Hospital in its official capacity, and (2) the employees of Children's Hospital and the County. Doc. 41.

According to the Sixth Circuit, the facts presented in the Complaint demonstrate that Children's Hospital and JFS "relied on each other for keeping Minor Siefert at the hospital" and those "facts plausibly establish[ed] Children's state-actor status." *Siefert*, 951 F.3d at 760. As to the alleged constitutional violation and qualified immunity asserted, the Court of Appeals ruled that Defendants plausibly "violated the Sieferts' due process rights" because they failed to provide the parents with a hearing or some other procedural safeguard. *Id*. at 764. According to the Sixth Circuit, the special protection under our Constitution of parental due process rights was "beyond debate" at the time of the Sieferts' daughter's hospitalization

---

[3] Honorable Timothy S. Black entered the Order of dismissal and to stay proceedings in the case on August 2, 2018. *See* Doc 32. This case was transferred to the docket of the undersigned by Order of then-Chief Judge Algenon L. Marbley. *See* Doc. 83.

according to the Complaint. *Id.* at 765. The Appeals Court then reversed and remanded the case finding that Plaintiffs' claims predicated on violations of procedural due process were plausible. *Id.* at 768. Following the Circuit Court's ruling, a petition for a writ of certiorari was filed, but denied by the Supreme Court. Doc. 44. Defendants, thereafter, answered the Complaint (Docs. 45, 47); the parties have completed discovery in the case, and the issues are now fully briefed.

Presently before the Court are three summary judgment motions filed under seal. The County and the Children's Defendants filed Motions for Summary Judgment and Plaintiffs filed a cross Motion for Partial Summary Judgment. Docs. 120, 121, 134. Defendants request that summary judgment be entered in their favor based on two issues: lack of state action and qualified immunity.

In connection with whether it engaged in state action, Children's Hospital argues that all determinations made by the doctors were medical decisions; all discussions with employees at JFS or the County were required by statute; and Plaintiffs' claims fail as a matter of law because but-for or proximate causation cannot be shown. Regarding qualified immunity, JFS Defendants argue that they never had physical or legal custody of Minor Siefert during the events in question; and Children's Hospital argues that the risk that Minor Siefert would commit suicide justified their refusal to discharge her. Defendants both argue that parental consent and the failure to pursue state law remedies are fatal to Plaintiffs' claims. *See Parratt v. Taylor*, 451 U.S. 527 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984).

Plaintiffs, by contrast, contend they are entitled to partial summary judgment and that the only thing that might require a trial is the determination of damages they are owed based on Defendants' violation of their due process rights under the Fourteenth Amendment. Doc.

4

134, PageID 6991. As to state action, Plaintiffs maintain that the County and Children's Hospital frequently collaborated and worked in tandem to keep the Sieferts' daughter away from them. *Id.* at PageID 6982.

As for Defendants' claims of qualified immunity, Plaintiffs contend that they were improperly denied a hearing within a reasonable time; that the Sieferts did not consent to their daughter's continued hospitalization; and that Minor Siefert's allegations of child abuse and assertions of suicidal ideations did not justify their being denied a hearing. Defendants filed responses in opposition (Docs. 145, 146) to Plaintiffs' Motion for Partial Summary Judgment and Plaintiffs replied to same (Doc. 148). Plaintiffs also filed a memorandum in opposition to Defendants' Motions (Doc. 140), and Defendants replied (Docs. 141, 142). Each party has filed Proposed Undisputed Facts. *See* Docs. 120-1, 121-1, 136-1. The parties' cross motions for summary judgment are now fully briefed and ripe for decision.[4]

For the reasons stated below, the Court **DENIES** the Motions for Summary Judgment (Docs. 120, 121) filed by Defendants and **DENIES** Plaintiffs' Partial Motion for Summary Judgment (Doc. 134). The Court will set this matter for a Telephone Status Conference by separate entry.

## II.     BACKGROUND

When Minor Siefert[5] reached age fifteen she began experiencing symptoms of depression and communicated this to her parents and pediatrician. *See* Doc. 113-3, PageID

---

[4] Plaintiffs filed a motion seeking to provide the Court with supplemental authority. Doc. 151. Defendants responded in opposition; Plaintiffs replied. *See* Docs. 152, 153, 154. Plaintiffs' motion attempts to raise novel legal arguments that are not relevant to the decision in the case. By separate order entered in the case, the Court denied the motion. Doc. 155. *See Adam v. Nakhle*, No. 1:22-CV-2183, 2023 WL 8004712, at *20 (N.D. Ohio Nov. 17, 2023).

[5] For purposes of this Opinion, Minor Siefert will be referred to using she/her pronouns.

5579. On November 30, 2015, Minor Siefert was referred to outpatient treatment at Children's Hospital and began receiving treatment from Dr. Patricia Kerregan ("Dr. Kerregan"). *Id*. During one of her sessions with Dr. Kerregan, Minor Siefert revealed feelings of gender dysphoria, including "anxiety, depression, suicidal ideation, and traumatic stress" related to her gender identity. *Id*. Minor Siefert informed Dr. Kerregan that "her parent's negative dialogue about individuals who identify" as transgender worsened her condition. Doc. 113-3, PageID 5553. Afterwards, Minor Siefert wrote several letters to her parents detailing her feelings of gender dysphoria and complaining about the alleged emotional and physical abuse the Sieferts exhibited towards her. Doc. 109, PageID 1719–38 ("Whenever I'm home, I feel like I'm on a tight rope . . . I could slip up and tell you that I'm a boy at the wrong time, which could lead to emotional or physical abuse.").

Over the next several sessions, Minor Siefert continued to share stories with Dr. Kerregan of alleged abuse, including the use of trans-related slurs and physical abuse such as wrist-grabbing by her father, Mr. Siefert. Doc. 113-3, PageID 5567, 5572. About a year after she began treating with Dr. Kerregan, on November 9, 2016, Dr. Kerregan contacted JFS and reported the alleged abuse. Doc. 117-13, PageID 5711. The next day, on November 10, 2016, Minor Siefert emailed JFS recounting the alleged mental and physical abuse she was experiencing at the hands of her parents. Doc. 109, PageID 1744–45.

From that point forward, JFS began investigating Minor Siefert's claims of parental abuse. The JFS intake supervisor, Eric Young ("Mr. Young"), assigned Minor Siefert's case to Rachael Butler ("Ms. Butler"), a caseworker who handled the day-to-day investigation. Doc. 101, PageID 1104. That same day, Ms. Butler visited Mrs. Siefert at home and later

stopped by Minor Siefert's high school to investigate the allegations. Doc. 117-41, PageID 5861, 5864.

On November 13, 2016, three days after their daughter had sent the email to JFS, Mr. and Mrs. Siefert admitted her to Children's Hospital. Doc. 109, PageID 1715. Minor Siefert remained there until December 20, 2016, *for approximately thirty-seven days. Id*. Upon Minor Siefert's arrival at the hospital, the Sieferts signed a Consent for Medical Treatment. The form reads, in relevant part, as follows:

> I authorize [Children's Hospital] and the doctor(s) participating in the care of my/our child to use any treatment or procedures that may be deemed necessary in the medical . . . care and that may be reasonably expected to be part of the normal inpatient or outpatient service . . . I understand that during the diagnostic or treatment process, the medical team may determine that it is in the best interest of my child to refer him/her to other services within [Children's Hospital]. I authorize such transfer and treatment. This authorization shall allow the doctors to provide continuing services *until revoked by me in writing*.

Doc. 113, PageID 5088 (emphasis added).

Shortly after being admitted to Children's Hospital and after being diagnosed with severe depression and "suicidal ideation[s], among other conditions, Minor Siefert was transferred to the Division of Psychiatry."[6] Doc. 117-16, PageID 5732. Thereafter, she began receiving treatment from the following medical professionals employed by Children's: Dr. Daniel Almeida ("Dr. Almeida"), attending physician; Dr. Jennifer Bowden[7] ("Dr. Bowden"), attending physician; Dr. Suzanne Sampang ("Dr. Sampang"), clinician; Dr. Ankita Zutshi ("Dr. Zutshi"), psychiatry fellow; Ms. Lauren Heeney ("Ms. Heeney"), unit

---

[6] Children's Hospital's policy for Emergency Medical Treatment of Juvenile (Section 3.2.4.3) allows Children's staff to treat minor patients during emergencies despite parental objections. Doc. 102, PageID 1245.

[7] Dr. Jennifer Bowden did not serve as attending physician at all relevant times. Pursuant to the record, Dr. Bowden filled in as attending physician on December 2, 2016. Doc. 105, PageID 1485.

manager; and Ms. Kimberley Stephens, LISW ("Ms. Stephens"), social worker and therapist supervised by Dr. Almeida.

On November 22, 2016, Dr. Zutshi spoke with a physician reviewer from Humana, the Sieferts' health insurance carrier, regarding the status of Minor Siefert's condition. The next day, Humana issued an adverse determination letter to Mr. Siefert, which stated, in relevant part:

> This letter is notice of an adverse benefit determination . . . [Minor Siefert] was certified inpatient treatment from 11/14/2016-11/20/2016 . . . . The review between [Dr. Zutshi] and our physician reviewer was completed on 11/22/2016. The result of this review was that your daughter does not meet criteria for this level of care . . . your daughter has no acute symptoms that require 24 hour care . . . She is not a danger to herself or others. She is not aggressive. . . . She is not manic. Inpatient treatment is denied 11/21/2016 – forward.

Doc. 130, Page ID 6888.

Not long after the Sieferts received the letter from their insurer, the parties held the first of several meetings, which shaped the trajectory of the case. Doc. 98, PageID 770. At Children's Hospital, Ms. Stephens, Children's social worker, and the Sieferts met to discuss next steps considering Humana's adverse determination letter. *Id*. Because Ms. Butler, the JFS caseworker, would be out of the office until after Thanksgiving weekend, Ms. Stephens communicated to the Sieferts that there was "nothing that she could do regarding [their daughter's] discharge" at that time. Doc. 98, PageID 770–71.

Mr. Siefert then called Ms. Butler and orally requested Minor Siefert's discharge. Doc. 98, PageID 775. But, according to the Sieferts, nothing changed regarding the status of their daughter. *Id.* As a result, a train of daily communications via phone calls, hospital notes, and regular meetings began to flow between the Sieferts, JFS, and Children's Hospital. These meetings were almost always coordinated by Children's Hospital. Doc. 143, PageID 7912;

8

Doc. 100, PageID 1016. However, the day before Thanksgiving in 2016, a critical change to Minor Siefert's care and treatment at Children's Hospital occurred. On that day, Dr. Zutshi's medical notes reflected the following message:

> Patient not to be discharged AMA *on request of parents*. JFS is actively pursuing the case and have directed that JFS helpline /241-KIDS be called for an emergency order (EO) for guardianship, so that *the parents can not take patient* AMA. If parents are in unit, security also needs to be called. Staff on unit and resident on call made aware of the said plan.

Doc. 113, PageID 3336 (emphasis added).

Brought on by Dr. Zutshi's note, a dramatic shift in in the relationship between Children's, JFS, and Sieferts occurred. Dr. Almeida wrote in his medical notes on November 23, 2016, that "JFS gave clear recommendations to not allow [Minor Siefert] to be discharged to parents." Doc. 129, PageID 6501. Ms. Butler, the JFS caseworker and named Defendant in the case who had been given responsibility for the day-to-day investigation, then communicated the same message to Ms. Stephens, evidenced in the hospital notes from November 23, 2016. Doc. 129, PageID 6510 ("Ms. Butler stated that [Minor Siefert] should not be able to go with parents and if parents try to take [Minor Siefert] AMA staff is to call [JFS] . . ."). Ms. Stephens communicated in her medical notes that JFS—not Children's Hospital—held "the key" to where Minor Siefert would be placed. Doc. 129, PageID 6588. Ms. Butler later testified that JFS had become "part of the [hospital's] team at that point." Doc. 100, PageID 1016.

Days later, on November 25, 2016, Mr. Siefert called Children's Hospital's complaint line to voice his concerns about his daughter's discharge. Doc. 131, PageID 6926. During that call, Mr. Siefert requested Minor Siefert's discharge from the hospital and stated that he felt "stonewalled" by staff. *Id*. Mr. Siefert's message was later relayed to Dr. Almeida by a hospital

staff member. *Id*. Dr. Almeida instructed the staff member to tell the Sieferts to contact JFS because they had "the authority at th[at] time." *Id*. at PageID 6927.

Subsequently, on November 28, the Sieferts met with Ms. Stephens, the Children's Hospital social worker; Ms. Heeney, the Children's Hospital unit manager; and Ms. Butler, the JFS caseworker assigned to Minor Siefert's case; all named Defendants. Doc. 129, PageID 6532–33. Ms. Heeney joined the meeting with the Sieferts specifically to discuss patient rights and Children's Hospital's visitation policy. *Id*. Over the phone, Mr. Siefert asked Ms. Butler "what he need[ed] to do to get his daughter back," and stated that Minor Siefert "should be discharged to him." *Id*. At the conclusion of the meeting, the County sought to "discuss [a] plan for [Minor Siefert] to be discharged to [a] foster home." *Id*. The next day, "in an act of desperation," Mr. Siefert emailed Jeff Aluotto, Hamilton County Administrator, asking for help on how he might orchestrate his daughter's release from Children's Hospital. Doc. 98, PageID 797.

Mr. Aluotto forwarded the email to Moira Weir ("Ms. Weir"), the JFS Director.[8] Doc. 115, PageID 5600–01. Ms. Weir then forwarded the email to Mary Eck, the head of the Children's Hospital's Services section at JFS. *Id*. Then, on November 30, the Sieferts met with Mr. Young and Ms. Butler. Doc. 99, PageID 941. During that meeting, the Sieferts reiterated their desire to have Minor Siefert discharged. *Id*. Mr. Young, the JFS intake supervisor, and Ms. Butler informed the Sieferts that JFS was "bound by the . . . doctors' recommendations." *Id*. However, after the meeting on December 7, 2016, "Mr. Young and Ms. Butler both agreed that [Minor Siefert] could not go home." Doc. 129, PageID 6569.

---

[8] Ms. Weir was responsible for implementing JFS's policies and programs. Doc. 115, PageID 5588. Under JFS' policy, JFS case workers were designated as duly authorized officers of the court. *Id*. at PageID 5594.

When Dr. Almeida went on vacation in December 2016, Dr. Bowden became the attending physician in charge of Minor Siefert's care. Doc. 105, PageID 1485. During that time, Dr. Bowden entered numerous progress notes in Minor Siefert's medical records intimating Children's Hospital's ongoing "collaboration with JFS." Doc. 113, PageID 3400, 3406, 3409. As a result, Minor Siefert remained at Children's until nearly the end of December 2016. Doc. 109, PageID 1715. Then, on December 20, 2016, the Sieferts' signed a voluntary safety plan which allowed Minor Siefert to temporarily live with her grandparents. Doc. 113-2, PageID 5374–75. Minor Siefert was discharged the very same day. Doc. 109, PageID 1715.

## III.    STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

11

is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is *material* if its resolution affects the outcome of an action, and a dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that demands submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

Furthermore, as here, when parties file cross motions for summary judgment, "[e]ach party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law." *Fed. Energy Regul. Comm'n v. Coaltrain Energy, L.P.*, 501 F. Supp. 3d 503, 522 (S. D. Ohio 2020). "The fact that one party fails to satisfy that burden on his or her own Rule 56 motion does not automatically indicate that the opposing party or parties satisfied the burden and should be granted summary judgment on the other motion." *Id*.

## IV.   LAW AND ANALYSIS

As directed by the remand order from the Sixth Circuit's opinion in *Siefert*, this Court must first address Defendants' state action and qualified immunity defenses. The Court will then focus on the partial summary judgment motion filed by Plaintiffs.

### A. State Action

Due process protections are limited as it relates to private action. As to that, the Due Process Clause is restricted and "has little to say about what private parties must do." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 759 (6th Cir. 2020). As such, liability "attaches only to those wrongdoers who carry a badge of authority of a State and represent it in some capacity." *Nat'l*

*Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (quotation omitted). Because private actors may not be held accountable under the Due Process Clause "for conduct [of] which they cannot fairly be blamed." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982).

Exceptions exist, of course. Because circumstances arise when parties *can* "fairly be blamed," and in those cases, private actors are converted into state actors subject to liability under the Due Process Clause. *Id*. To assist with identifying which private actors may qualify as state actors, three tests have been articulated by the Supreme Court: "(1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). Of the three, the symbiotic relationship or nexus test is most relevant here. *Siefert*, 951 F.3d at 761 (applying the symbiotic relationship or nexus test on appeal). The determination of state action is a question of law but requires a fact-specific analysis. *See Lugar*, 457 U.S. at 939 (calling the state action determination a "necessarily fact-bound inquiry").

At bottom, the analysis "comes down to whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Siefert*, 951 F.3d at 759–60 (quotations and citation omitted); *see also Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992); *Lugar*, 457 U.S. at 941 (Joint participation with state officials is "sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."). Put differently, the state and the private actor must sufficiently intertwine and the "ties between" them must be significant. *Jackim v. City of Brooklyn*, No. 1:05-cv-1678, 2007 WL 893868, at *24 (N.D. Ohio Mar. 22, 2007) (citing *Wolotsky*, 960 F.2d at 1335). But "[m]ere approval or acquiescence" does not convert a private actor into a state actor. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

13

The Sixth Circuit, in *Siefert*, established a road map for this Court to adhere to. On appeal, the Sixth Circuit did not make a state action determination because, at the motion to dismiss stage, the record had not been fully developed. But according to the Appeals Court, the following facts as alleged in the Complaint "plausibly establish[ed]" state action:

    a. Children's admitted it needed the [C]ounty's permission to send Minor Siefert home;

    b. Meetings at Children's often included the Sieferts, Children's employees, and the [C]ounty officials together;

    c. The County defendants "told Ms. Stephens that Minor Siefert 'could not go home' and Stephens relayed that message to the Sieferts, telling them "JFS holds the key in determining where patient goes";

    d. Dr. Almeida wrote that Children's could not release Minor Siefert because "JFS gave clear recommendations to not allow patient to be discharged to parents"; and

    e. [Generally,] It would have been hard to know who could discharge Minor Siefert—Hamilton County or Children's.

*Siefert*, 951 F.3d at 760–61.

        i. *Defendants' arguments in support of state action*

            1. *Private conduct*

Children's Hospital claims that it was "engaged in purely private conduct" and decisions regarding Minor Siefert's discharge were medical decisions made independently by Dr. Almeida and Dr. Bowden. Doc. 121, PageID 6110; Doc. 102, PageID 1202 ("What determined my opinion and my recommendation for the patient to not leave the hospital was because, as a psychiatric expert, we had very clear and convincing evidence from the patient that she would die by suicide."); *id*. at PageID 1208 ("I was informed by JFS that they also had concerns, but I was not part of their decisionmaking process."). Dr. Bowden testified that she made an "independent medical decision" not to discharge Minor Siefert without taking orders from JFS. Doc. 105, PageID 1524–25. Conversely, Plaintiffs assert that the County

and Children's Hospital worked in tandem, collaborated frequently, and depended on each other to keep the Sieferts away from their daughter. Doc. 134, PageID 6982–84.

Children's Hospital cites *Thomas v. Nationwide Child.'s Hosp.*, 882 F.3d 608, 614 (6th Cir. 2018), for the proposition that state action must be a "but-for cause . . . of an injury." *Id.* ("When state action is not even a but-for cause, let alone a proximate cause, of an injury, a § 1983 claim necessarily fails as a matter of law."). According to Children's Hospital, Minor Siefert would have remained at the hospital based on concerns that she might commit suicide regardless of the County's involvement, thus, Plaintiffs cannot connect the alleged violation to state conduct. Doc. 121, PageID 6134. But the evidence shows something different. In fact, Children's Hospital's decisions were sometimes made at the County's direction. As noted, Children's Hospital relies, in part, on Dr. Almeida's and Dr. Bowden's deposition transcripts to show that decisions regarding Minor Siefert were based solely on their medical determinations. *Id.* at 6110.

However, upon closer examination, the testimony contained in the deposition transcripts and the medical notes—contemporaneously recorded during the events in question—conflict. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When [there are] two different stories [presented], one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Paul W. Kaufman, *et al.*, *Toward a Presumptive Admission of Medical Records Under Federal Rule of Evidence 803(4),* 64 B.C. L. Rev. 567, 616 (2023) (arguing that medical records are more reliable than witness testimony since "they are untainted by litigants' conscious or unconscious biases."). After viewing all reasonable inferences in favor of Plaintiffs, the overwhelming evidence in the case shows that Children's Hospital's decisions were not

"purely" medical. Doc. 121, PageID 6110. Some determinations were made based on directions Children's Hospital received from the County.

Here, the evidence reveals that Ms. Butler, the JFS caseworker and named Defendant in these proceedings, issued instructions that Children's Hospital invariably complied with. Doc. 129, PageID 6510; *see Tarkanian*, 488 U.S. at 195 ("[The] State may delegate authority to a private party and thereby make that party a state actor."). In doing so, Ms. Stephens, the Children's Hospital social worker and named Defendant, also acknowledged the County's decision-making power. Doc. 129, PageID 6588 (stating that the County held "the key" to where the child would be placed). In turn, Dr. Almeida also wrote in his medical notes that "JFS gave clear recommendations to not allow [Minor Siefert] to be discharged to [her] parents," and then two days later, on November 25, communicated to Jane Hess, a hospital employee, that the County had "authority" during that time. Doc. 129, PageID 6501; Doc. 131, PageID 6927.

In addition to that evidence, Dr. Zutshi's pre-2016 Thanksgiving medical notes state that Minor Siefert was not to be released on request of her parents. Doc. 113, PageID 3336. Indeed, when Dr. Bowden took over as attending physician in 2016, she became Minor Siefert's primary physician and saw her daily. Doc. 105, PageID 1485. Several times, she announced Children's continued "collaboration" with the County in her medical notes. Doc. 113, PageID 3400, 3406, 3409. Collectively, these facts all clearly demonstrate that Children's actions were at times made at the behest of the County, creating the link needed to show but-for or proximate causation. *Lugar*, 457 U.S. at 937 (stating that "the weight of the State behind . . . private decision[s]" reflects state action).

16

2. *Statutory communications as a defense*

Children's Hospital seeks to defend against liability by claiming that its employees' communications with JFS were "statutorily expected" under R.C. § 2151.421(D)(3), which, in relevant part, provides:

> If a health care professional provides health care services in a hospital, children's advocacy center, or emergency medical facility to a child about whom a report has been made . . . the health care professional may take any steps that are *reasonably necessary for the release or discharge of the child to an appropriate environment.* Before the child's release or discharge, the health care professional *may obtain information, or consider information obtained*, from other entities or individuals that have knowledge about the child.

Ohio Rev. Code Ann. § 2151.421 (emphasis added); Doc. 121, PageID 6130.

Unfortunately, for Children's, the evidence tells a different story—one that entails much more than merely obtaining information. The record reveals that regular meetings were held between representatives from JFS, Children's Hospital, and the Sieferts on several occasions during November and December of 2016. Those meetings were almost always coordinated by Children's Hospital. Doc. 143, PageID 7912; Doc. 100, PageID 1016. Ms. Butler, the JFS caseworker and named Defendant, in her testimony stated that JFS had become "part of the [hospital's] team at that point," because JFS had an open case. Doc. 100, PageID 1016. Taken together, the evidence all shows that Children's collaboration with the County, exceeded compliance with the statute and, instead, suggests a "deep and symbiotic relationship between Children's and the county," beyond mere acquiescence. *Siefert,* 951 F.3d at 761.

More probative of Children's linkage to the County and the coordination of effort between the two organizations is the fact that "it would have been hard to know who could discharge Minor Siefert—Hamilton County or [Children's Hospital]." *Id.* According to Dr.

17

Almeida, JFS had "the authority." Doc. 131, PageID 6927. But as communicated by JFS, it was "bound by the . . . doctors' recommendations." Doc. 99, PageID 941. As noted by the Sixth Circuit in *Siefert*, "when the distinction between the state and private party breaks down to that degree, a private party becomes a state actor in § 1983 cases." *Siefert*, 951 F.3d at 761. Having now been presented with the entire record on remand, following the parties' completion of discovery, the facts displayed practically mirror those that the Sixth Circuit cited in the *Siefert* decision as ones that would qualify the relationship between Children's and the County as symbiotic.

For some of these same reasons, the Court finds that Children's Hospital and named Defendants, Dr. Almeida, Dr. Bowden, Dr. Zutshi, and Ms. Stephens, also became state actors. The individual actions taken by each of these named Defendants shows that they collaborated with JFS to refuse the release of Minor Siefert to her parents. Under the circumstances, this created a symbiotic relationship between Defendants, Dr. Almeida, Dr. Bowden, Dr. Zutshi, and Ms. Stephens, and JFS. The same cannot be said, however, of two other Children's employees who are also named Defendants in this lawsuit. Ms. Heeney, Children's unit manager attended a joint meeting with the Sieferts, Ms. Stephens, and Ms. Butler on November 28, 2016. Doc. 129, PageID 6533. That meeting was only to discuss patient rights and Children's Hospital's visitation policy. *Id.* This evidence, without more, fails to tie Ms. Heeney in any meaningful way to the coordinated efforts between JFS and Children's to keep Minor Siefert from being released to her parents. Similarly, the record is void of any specific actions taken by Dr. Sampang that evidences her collaboration with the County. *Id.* As such, Ms. Heeney and Dr. Sampang do not satisfy the criteria established under the symbiotic relationship or nexus test to qualify them as state actors.

### B. Qualified Immunity

For government officials, qualified immunity can offer a shield from civil liability. Unless, of course, the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Under the umbrella of qualified immunity, government officials enjoy "breathing room," which allows them to make "reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *Bambach v. Moegle*, 92 F.4th 615, 622 (6th Cir. 2024) ("The immunity serves dual values: ensuring that wronged individuals can vindicate their constitutional rights while simultaneously reducing the social costs that result from subjecting public officials to increased litigation.").

Under 42 U.S.C. § 1983, Plaintiffs must show that: (a) a person acting under color of state law, (b) deprived them of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Wolotsky,* 960 F.2d at 1335. Having determined that named Defendants Dr. Almeida, Dr. Bowden, Dr. Zutshi, Ms. Stephens, and Children's collaborated with JFS in refusing to release Minor Siefert from the hospital and thus all became state actors, the Court must now determine whether these same Defendants deprived Plaintiffs of clearly established constitutional rights which a reasonable person would have known—here their right to procedural due process—or for the Sieferts to have been given a hearing related to the release of their daughter within a reasonable period of making that request.

### i. *Deprivation of a right secured by the Constitution*

It is axiomatic that parental rights are "deeply rooted" in our country's history and tradition. *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977). As such, courts are uniform

19

in holding that parents have a fundamental liberty interest to raise their children. *Id.* ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *Siefert*, 951 F.3d at 764 ("In case after case, the Supreme Court has emphasized the parent-child relationship's special place in our society.").

This right is not easily diminished. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents . . . does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."); *Kottmyer v. Maas,* 436 F.3d 684, 689 (6th Cir. 2006) (For parents, that "relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law"); *Stanley v. Illinois,* 405 U.S. 645, 651 (1972) (Familial protections are "far more precious . . . than property rights" (quotation omitted)). And so, violations of the interest triggers due process protections, which typically "requires a hearing within a reasonable time" for "[e]ven a temporary deprivation of physical custody." *Eidson v. Tenn. Dept. of Child.'s Servs.*, 510 F.3d 631, 635 (6th Cir. 2007).

But due process protections are not absolute. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012). What matters in the analysis is whether the official had "fair warning" that their actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002). Courts do not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. So, although deeply rooted, parental interests must be "counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is necessary

20

as against the parents themselves." *Kottmyer*, 436 F.3d at 690 (citing *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999)).

The Court addresses briefly the arguments made by Defendants and then separately the issue of consent. For the reasons stated below, Plaintiffs have established the deprivation of their constitutional due process rights which were clearly established when Defendants, acting in concert, refused to release Minor Siefert from the hospital. Plaintiffs cannot prevail on that basis alone, however. The Court also finds that there is a triable issue of fact as to consent, i.e., whether the Sieferts properly revoked their authorization for the care and treatment of their daughter they surrendered to the medical team at Children's when admitting her.

### 1. *Defendants' arguments*

Here, Plaintiffs assert that Defendants should have provided them with a hearing regarding their request to have their daughter discharged from the hospital, by November 25, 2016, at the very latest. Doc. 136-1, PageID 7627–28. In response, Defendants assert that a hearing was not required for several reasons. First, the County asserts that there was no deprivation caused by the County Defendants because they never had physical or legal custody of the child during the events in question. Doc. 120, PageID 6082–84. Plaintiffs respond that the question of physical or legal custody "is not relevant" to the due process analysis. Doc. 140, PageID 7703. Though parental rights are not infringed by a mere investigation, the County's argument significantly downplays their actions in this case. *See Kottmyer*, 436 F.3d at 691. What the law requires is not necessarily that the agency had physical custody, but that there was an interference with parental custody which caused a deprivation of Plaintiffs' due process rights. *Bambach*, 92 F.4th at 624 ("[T]he state's

termination of or *interference* with parental rights—even temporarily—requires some measure of procedural protection.") (emphasis added).

As noted, the County played a direct role in keeping Minor Siefert at Children's Hospital and away from her parents. Some of the clearest examples include when JFS employees routinely participated in phone calls and meetings with the named Defendants at Children's and those staff members working in concert refused to release Minor Siefert to Plaintiffs. Another example occurred when Ms. Butler directed Children's Hospital staff to call the County's helpline and submit a report if the Sieferts ever tried to take their daughter. *See* Doc. 129, PageID 6510. That evidence is further corroborated by the records discovered at Children's which indicated that the County had "the authority" at the time, *see* Doc. 131, PageID 6927, and held "the key" to the child's next steps, meaning whether Minor Siefert would go or stay at the hospital. Doc. 129, PageID 6588. All these factors taken together demonstrate a pattern by the County and its officials of interfering with the Sieferts' parental due process rights.

Second, the County argues that R.C. § 2151.31 specifies certain instances where a duly authorized officer may take a child into custody. Doc. 120, PageID 6084–86. One of those instances authorized by the statute is when, "there are reasonable grounds to believe that the child is in immediate danger. . ." Ohio Rev. Code Ann. § 2151.31(A)(3)(b). Based on this argument, the County contends that because Minor Siefert was already safe at Children's and not in any immediate danger, the County was able to save the step of requesting custody under the statute and having to remove her from her parents. Doc. 120, PageID 6084–86. The problem with this argument is that it completely ignores Fourteenth Amendment Due Process Clause precedence in the context of parental rights. Regardless of the state statute which

"allowed" a request for a hearing, the Due Process Clause required one because of Defendants' refusal to release Minor Siefert to her parents. At minimum, "[e]ven a temporary deprivation of physical custody requires a hearing within a reasonable time" under the Due Process Clause. *Eidson*, 510 F.3d at 635. So, although the Ohio statute provided the County with an option, the Due Process Clause did not.

Children's primary argument is that it had a "compelling interest in protecting Minor Siefert from [suicide] that greatly outweighed" the Sieferts' liberty interest. Doc. 121, PageID 6132–33 ("[Dr. Almeida and Dr. Bowden] acted to protect Minor Siefert from fatal harm by refusing to discharge her" to her parents). On the other hand, Plaintiffs assert that the child abuse allegations and Minor Siefert's alleged suicidal ideations should not have dictated whether the Sieferts were entitled to a hearing. Doc. 140, PageID 7695–99. The Court agrees. The issue, as asserted by Children's, is not whether Minor Siefert would be safe if and when she was released to her parents. Rather, the issue is whether the requirements of the Due Process Clause were met in this case. Defendants could have met the requirement by providing a hearing within a reasonable time. *Siefert*, 951 F.3d at 764; *Bambach*, 92 F.4th at 624 ("Absent certain exigent circumstances, the state's termination of or interference with parental rights—even temporarily—requires some measure of procedural protection, like proper notice and an opportunity for a hearing."). Instead, Defendants prevented Minor Siefert's discharge for nearly a month without providing any form of due process.

### 2. *Consent*

When present, consent typically eliminates the due process hearing requirement. *Smith v. Williams-Ash,* 520 F.3d 596, 600 (6th Cir. 2008). ("[W]hen a parent voluntarily consents to a safety plan [in a child-abuse investigation], 'no hearing of any kind is necessary;

hearings are required for deprivations taken over objection, not for steps authorized by consent'" (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761–62 (7th Cir. 2006)); *Teets v. Cuyahoga Cnty., Ohio,* 460 F. App'x 498, 503 (6th Cir. 2012) ("[H]earings, however, are required only when a child's removal is instituted or sustained over the parents' objections."); *Schulkers v. Kammer*, 955 F.3d 520, 542 (6th Cir. 2020) ("[A] hearing is not required when parents voluntarily consent to the terms of a prevention plan.").

So long as it is explicit, consent can be revoked. *Bambach*, 92 F.4th at 624 ("[O]ur prior cases have suggested that parents should 'explicitly withdraw the consent they explicitly gave.'"). So, here, the proper question is not whether the Sieferts voluntarily admitted Minor Siefert to Children's at one point, but rather whether the decision to have her admitted by her parents remained *consensual*. *Schulkers*, 955 F.3d at 546.

That said, a parents' ambiguous expressions or "mere displeasure and frustration fails to negate . . . consent." *Williams-Ash*, 520 F.3d at 601. The plaintiffs in *Williams-Ash* initiated an action under § 1983 after a county social worker removed their children from their home. *Id.* at 598. Shortly after the removal, the plaintiffs in that case voluntarily entered into a safety plan and "never alleged that they attempted to contact . . . anyone . . . at Children's Services to revoke their consent." *Id.* at 600. The Sixth Circuit noted that "repeated inquiries" about the length of an investigation and questions about what needed to be done to "speed the children's return" were not explicit and did not effectively revoke consent. *Id.* at 600–01. The plaintiffs in *Williams-Ash* also failed to follow the safety plan's instructions related to "rescinding the plan" which required them to only verbally advise the caseworker of their interest in revoking the plan. *Id.* On the other hand, in *Schulkers*, the plaintiffs there "made repeated requests to be released from the Prevention Plan," which included phone calls over

24

a span of several weeks. *Schulkers*, 955 F.3d at 546. In *Schulkers*, the Sixth Circuit affirmed the district court in holding that a triable issue of fact was present regarding whether the parents voluntarily remained in the plan. *Id.*

Here, Plaintiffs signed two agreements. First, Plaintiffs signed Children's Consent for Medical Treatment upon their daughter's admission to the hospital, which required authorization of her treatment to be revoked in writing. Doc. 113, PageID 5088. Second, Plaintiffs signed a safety plan the day their daughter was discharged from the hospital. Doc. 113-2, PageID 5374–75. The safety plan entered into was signed by the Sieferts and allowed for Minor Siefert to be released to her grandparents temporarily. *Id.* Children's asserts that Plaintiffs never took proper steps to initiate Minor Siefert's discharge based on the language of the Children's Consent for Medical Treatment form signed when Minor Siefert was admitted to the hospital. Doc. 143, PageID 7880. Put differently, according to Children's, because the Sieferts never revoked consent in writing as directed in the admitting document, their requests for Minor Siefert's discharge were insufficient. *Id.*

According to the County, the Sieferts consented to Minor Siefert's ongoing hospitalization because Mr. Siefert knew that "if he discharged his daughter [against medical advice] that JFS would file an emergency order." Doc. 142, PageID 7854–57. JFS asserts that this communication provided a process by which Mr. Siefert could have had his daughter released and that Mr. Siefert was aware of this process. *Id.* The County also asserts that the Sieferts continued attending meetings and engaging with the County and Children's staff, which showed their continued consent to have their daughter hospitalized. *Id.*

In *Bambach*, the Sixth Circuit put in perspective the dichotomy that often occurs when minors are removed from parents by stating:

25

> At one end, where state employees remove children from their parents' care without a valid court order and without either parental consent or pre-removal process, the state workers violate . . . the Fourteenth Amendment. . . At the other end though, where state workers receive parental consent to temporarily remove children from custody, the state employees do not violate any constitutional rights, even if they do not obtain a court order or follow any other process for removal.

*Bambach*, 92 F.4th at 623 (citations omitted).

The Sieferts' "claims sit somewhere in the middle" of the spectrum articulated in *Bambach*. *Id.* Because the Sieferts failed to revoke consent in writing, the Court is prevented from deciding the issue of consent on summary judgment. As to that issue, a genuine dispute of material fact exists. On one hand, a jury could find that Mr. Siefert's requests for his daughter's discharge were legally sufficient. Days after admitting their daughter to Children's Hospital, Mr. Siefert on multiple occasions requested—and often verbally demanded—her release. Plaintiffs' insistence on their daughter's release began when Humana, the Sieferts' health insurer, denied extended coverage for Minor Siefert's inpatient care. Doc. 109, PageID 1715; Doc. 143, PageID 7880; Doc. 113, PageID 3332.

The demands for release later escalated during numerous phone calls and several meetings held with staff at Children's, *see* Doc. 131, PageID 6926, finally culminating in Mr. Siefert contacting Jeff Aluotto, the highest-ranking administrative official at the County, in "desperation," who relayed the message to staff at JFS. Doc. 98, PageID 797. Unlike in *Williams-Ash*, where the parents voluntarily remained in a safety plan and did not contact any officials regarding their request for release of their child, the record here reflects that Mr. Siefert wanted his "daughter discharged" and that Defendants not only knew it but also worked in concert against it. *Williams-Ash*, 520 F.3d at 600; Doc. 98, PageID 811.

26

Here, also, the safety plan was not entered into until December 20, 2016—the day Minor Siefert was discharged from the hospital and placed in the care of her grandparents—over a month *after* she was admitted to Children's with the consent of her parents. Doc. 109, PageID 1715; Doc. 113-2, PageID 5374. In *Williams-Ash*, the parents were given the opportunity early on in the process to enter into an agreed safety plan at the time they consented to have their minor child removed from their home—not the case here. *Williams-Ash*, 520 F.3d at 598. In this case, the evidence shows that the Sieferts' verbal requests for the return of their daughter went well beyond expressions of "mere displeasure and frustration" but instead escalated to explicit demands for Minor Siefert's discharge. *Williams-Ash*, 520 F.3d at 601.

As was the case in *Schulkers*, it is quite possible for a jury to infer that Plaintiffs attempted to withdraw parental consent or that they may not have been properly presented with an opportunity to do so, in the first instance, given that no safety plan was ever put in place until very late in the process—some 37 days after they had taken their daughter to Children's—and the Sieferts had only the admission form, signed on November 13, 2016, upon which to rely which stated that their consent to the diagnosis, care, and treatment their daughter would receive from the medical team at Children's had to be withdrawn "in writing." *Schulkers*, 955 F.3d at 543; Doc. 113-2, PageID 5374 –76. Under the circumstances, Defendants' failure to timely offer the Sieferts a safety plan that fully explained their parental rights and how they might exercise them to regain authority over their minor child, (except for the one provided on the date of their daughter's discharge which called for the release of Minor Siefert to her grandparents, and not her parents, weeks after the Sieferts sought to

withdraw consent to her treatment), could very well be viewed by a jury as a failure to provide proper procedural protocols.

On the other hand, a jury could find that the Sieferts' verbal requests for discharge were insufficient simply because the parents failed to follow the required opt-out mechanism contained in the Children's Consent for Medical Treatment form. Doc. 113, PageID 5088 ("This authorization shall allow the doctors to provide continuing services *until revoked by* [the Sieferts] *in writing.*") (emphasis added). Previously, the Sixth Circuit has found that a failure to follow an opt-out mechanism in a safety plan—and for parents to request the release of their minor child through another unspecified method—was insufficient. *Williams-Ash*, 520 F.3d at 600 ("The plain-language [ in the safety plan] provided to the [plaintiffs] . . . told them to revoke their consent by advising their caseworker. To have opted out of the plan would have triggered consequences."). But as stated, the issue here stems from Children's reliance on the medical treatment form and not from a safety plan. Given these facts, the Court finds that there is "sufficient disagreement" between the parties as to whether Plaintiffs effectively revoked consent after signing Children's authorization form. *Moore*, 8 F.3d at 340.

Also critical to the Court's decision on whether Plaintiffs were deprived of a right secured by the Constitution is the amount of time Minor Siefert spent at Children's over the objections of her parents. For nearly a month, Defendants refused to release Minor Siefert or to give Plaintiffs a due process hearing. Under a different set of facts, say if Minor Siefert had only been kept at Children's for diagnosis and treatment for merely a 24, 48, or perhaps even a 72-hour "temporary" period for observation, the outcome here might be different. But, given the Sieferts' repeated demands for the return of their child, the amount of time Minor Siefert spent at Children's after objections by the Sieferts—nearly 30 days—and the long-standing

28

and "deeply rooted" liberty interest provided to parents under our Constitution, there is little doubt that a reasonable employee at Children's Hospital or JFS would have known that their actions violated "clearly established" federal law. *Luna*, 577 U.S. at 11 (quoting *Fitzgerald*, 457 U.S. at 818).

The Court finds that Plaintiffs were deprived of their due process rights under the Constitution's Fourteenth Amendment. In addition, the Court finds that there is a triable issue of fact as to whether Plaintiffs sufficiently revoked consent of their daughter's hospitalization.

### 3. *Parratt-Hudson Doctrine*

Citing the *Parratt-Hudson* doctrine, Children's and the County aver that Plaintiffs were required to exhaust state-law remedies before filing suit in this Court. Doc. 141, PageID 7838; Doc. 142, PageID 7861–63. Under the *Parratt-Hudson* doctrine, state law remedies can sometimes satisfy the due process requirement. *Parratt v. Taylor*, 451 U.S. 527, 538 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986); *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Flatford v. City of Monroe*, 17 F.3d 162, 168 (6th Cir. 1994) ("A citizen has no § 1983 cause of action, for instance, where state tort law furnishes all appropriate process, or where the deprivation cannot be predicted."). Children's and the County contend that Plaintiffs' failure to present their claims for inference with parental rights, lack of informed consent, medical battery, and others is fatal to their ability to bring suit at this time. Doc. 141, PageID 7838; Doc. 142, PageID 7861–63.

Under the *Parratt-Hudson* doctrine, when a constitutional violation is random and unauthorized, and the state could not have "provide[d] a meaningful hearing before the deprivation" occurred, then the *Parratt-Hudson* doctrine applies, which would require Plaintiffs to pursue state law remedies. *Zinermon v. Burch*, 494 U.S. 113, 129 (1990) (quoting

*Parratt*, 451 U.S. at 541). Put differently, under this doctrine, courts must allow states to remedy the alleged constitutional violation if the violation was so unpredictable that it could not have been prevented. Further, the doctrine does not apply if pre-deprivation procedures could have adequately "address[ed] the risk" ahead of time. *Id*.

To conduct this analysis, courts consider three factors outlined in *Zinermon v. Burch*:[9] (1) whether the deprivation was unpredictable, (2) whether the pre-deprivation process would have been impossible, and (3) whether the alleged conduct would have been categorized as unauthorized. *Schulkers*, 955 F.3d at 547; *Zinermon*, 494 U.S. at 136–38. *Schulkers* is illustrative. There, the plaintiffs filed a claim under § 1983 after a prevention plan "constrained the mother's ability to be alone" with her kids for roughly two months. *Schulkers*, 955 F.3d at 526. In that case, as in this one, the defendants argued that the *Parratt-Hudson* doctrine barred the plaintiffs' claims because adequate state law remedies were available. *Id.* at 547.

Following the *Zinermon* analysis, the Sixth Circuit said that the deprivation could not have been unpredictable because the defendants prepared for and intended to implement a prevention plan. *Id.* at 548. Regarding impossibility, the court stated that the defendants provided no reason why pre-deprivation procedures could not have been provided, thus the implementation of procedural safeguards was not impossible. *Id*. Finally, because defendants who were social workers had delegated authority and "at times [were] required to interfere with family relations," their choices could not have been random or unauthorized. *Id*. The court in *Schulkers* determined that the *Parratt-Hudson* doctrine did not apply under the facts presented in that case.

---

[9] The Supreme Court considered only deprivations of property in *Parratt* and *Hudson*. The Court, however, expanded the doctrine to include liberty interests in *Zinermon*, 494 U.S. at 132.

According to Children's and the County, Plaintiffs did not properly avail themselves of state law remedies before filing suit in this Court. Doc. 142, PageID 7861–63; Doc. 121, PageID 6134–36. They assert that Plaintiffs' lack of exhaustion is fatal to their § 1983 claims. *Id*. Separately, the County asserts, that the *Zinermon* analysis is not the correct test under these facts. Doc. 142, PageID 7862. According to the County, the test outlined in *Mathews v. Eldridge* is the more applicable one for the Court to follow. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). In *Zinermon*, the Supreme Court described the *Parratt-Hudson* doctrine as a "special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon*, 494 U.S. at 128.

Therefore, courts generally use *Mathews* to determine whether there was a procedural due process violation in the case and use *Parratt-Hudson* and *Zinermon* to determine whether state-law remedies satisfy the necessary due process. *Id*. Under the *Mathews* test, courts consider: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state's interest. *Mathews*, 424 U.S. at 335.

We begin with the proposition that the County Defendants, like *Schulkers*, "at times are required to interfere with family relations" and may lawfully remove children from their parents under certain circumstances. *Schulkers*, 955 F.3d at 548. Here, however, both analyses lead to unfavorable results for Defendants. First, under *Parratt-Hudson* and *Zinermon*, the due process deprivation that occurred in this case was not unpredictable. Ms. Butler, the case agent at JFS, visited Mrs. Siefert at her home and Minor Siefert at her school to investigate

the allegations *before* Minor Siefert was admitted to Children's. Doc. 117-41, PageID 5861, 5864. Once admitted, Children's became aware of the investigation as evidenced by the medical notes recorded by staff. Doc. 113, PageID 3336 ("Patient not to be discharged AMA on request of parents. JFS is actively pursuing the case . . ."). This case resembles *Schulkers* in the sense that the deprivation could not have been unpredictable because Defendants had to suspect, particularly considering the initial investigation and the length of time Minor Siefert spent at Children's, that a deprivation of parental rights could occur.

Second, the record shows that a pre-deprivation process was possible, given that Minor Siefert remained at Children's Hospital for nearly a month without the Sieferts being granted permission to remove her. Clearly, Defendants had more than sufficient time to present the Sieferts with certain procedural due process safeguards, including notice and an opportunity to be heard in a more meaningful manner than the meetings and phone calls they were offered.

Also, with regard to the third factor, the Court notes that hospital staff, at the time of Minor Siefert's admission, were authorized to treat children during emergencies over parental objections, but only if they followed Children's Emergency Medical Treatment of Juvenile policy. Doc. 102, PageID 1245–46. Under the circumstances, the evidence of record strongly suggests that Defendants' actions, which were tantamount to constitutional violations, were not random and unauthorized such that the state could not have "provide[d] a meaningful hearing before the deprivation" occurred. *Zinermon*, 494 U.S. at 129 (citing *Parratt*, 451 U.S. at 541). Accordingly, Plaintiffs' claims are not barred by *Parratt-Hudson*, which would have required Plaintiffs to pursue state law remedies before initiating the current litigation.

Shifting attention next to consideration of the tripart *Mathews* factors, the private interests implicated here are substantial. First, parental relationships, as has been noted

32

throughout this decision, are among the most protected under our Constitution and jurisprudence. *Schulkers*, 955 F.3d at 540. Second, the County's investigation was incomplete during Minor Siefert's hospitalization, creating a substantial risk that deprivation of custody could lead to a mistake. Doc. 117-41, PageID 5861. Third, the implementation of any number of available procedural safeguards would have added an invaluable layer of due process protection since none were provided. Finally, the state's interest of protecting children, especially those at risk of danger at the hands of their own parents, is an important consideration. But given that the County's investigation was incomplete, and Minor Siefert remained at Children's for almost a month (which provided a safe environment and time for a hearing), procedural safeguards should have been afforded to the Sieferts before a decision was made to keep their daughter and refuse their requests for discharge for an extended period of time. Under *Mathews*, the governmental interest was outweighed by the availability of providing adequate safeguards. *Mathews*, 424 U.S. at 335.

### 4. *Individual liability under § 1983*

The Court turns next to the question of liability for each of the defendants under § 1983 which must be determined "on an individual basis." *Jones v. City of Elyria, Ohio*, 947 F.3d 905, 913 (6th Cir. 2020). To find liability, the Court asks whether "the facts alleged show the [defendant's] conduct violated [or caused the violation of] a constitutional right." *Snyder v. United States*, 990 F. Supp. 2d 818, 837 (S.D. Ohio 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Stated differently, courts consider whether each defendant contributed or set the deprivation in motion. *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). The Court begins with a discussion of Children's Hospital's potential liability as an entity.

Following that, the Court will assess each Defendant's potential liability in their individual capacities.

i. *Children's entity liability (official capacity)*

It has long been the rule that plaintiffs in a § 1983 action cannot successfully assert vicarious liability or rely on respondeat superior theories to affix liability. *Novak v. City of Parma*, 932 F.3d 421, 436 (6th Cir. 2019) ("[Plaintiff] sues under § 1983, and under that law, a plaintiff cannot sue for vicarious liability or respondeat superior."). But Children's can be found liable under the *Monell* theory, which allows an entity, such as Children's, to be held liable so long as Plaintiffs can point to "any hospital policy or regulation or [allege] that any improper conduct arose from the deliberate failure to adequately investigate, train, or regulate employees." *Fountain v. St. Mary's Hosp. Saginaw*, No. 2:21-CV-12053, 2021 WL 4522297, at *2 (E.D. Mich. Oct. 4, 2021); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). What matters is whether the constitutional injury stems from a hospital policy or custom. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).

To determine liability, the Court must look to the face of the policy. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). Courts are cautious in doing so and place "some limitation . . . on establishing . . . liability through policies that are not themselves unconstitutional." *Id.* at 823. Put differently, the language of the hospital's policy should promote a constitutional violation on its own without the need for additional evidence, because "[o]bviously, if one retreats far enough from a constitutional violation some . . . 'policy' can be identified behind almost *any* such harm." *Id.* (emphasis added).

Plaintiffs point to the hospital's policy for Emergency Medical Treatment of Juvenile, which allows Children's staff to treat minor patients during emergencies, regardless of

34

parental objections. Doc. 102, PageID 1245–46. In his deposition, Dr. Almeida explained the policy to mean that the hospital employees held a "mutual agreement and understanding" that during an emergency, when parents refuse to consent, then he could treat his patients based on what was "immediately necessary to preserve [a] child's health and well-being." *Id*. According to Plaintiffs, Children's policy caused the constitutional deprivation in this case. Doc. 140, PageID 7734. In response, Children's asserts that the policy did not promote the violation because Children's only acted to protect the child from committing suicide. Doc. 141, PageID 7832.

It is a well-settled constitutional principal that a parent's right to due process is not absolute, particularly in the case of emergencies where there is "reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). When that occurs, officials must step in to protect children regardless of parental objections. *Doughty v. Tennessee Dep't of Child.'s Servs.*, No. 3:15-CV-102, 2016 WL 1706145, *7 (E.D. Tenn. Apr. 28, 2016) (stating that an exception to the general rule for hearings within a reasonable time "exists where exigent circumstances . . . require swifter . . . action"). Here, the Court cannot establish entity liability based on the language of the policy alone. Plaintiffs would have to provide additional evidence to prove that Children's policy is unconstitutional beyond its written language allowing doctors to treat children in imminent danger despite parental objections. Thus, the policy alone is not unconstitutional on its face.

Beyond that, Plaintiffs have not asserted that the violation was more than just a one-off event. Mere one-offs are generally insufficient to establish an unlawful policy and to create entity liability under § 1983, particularly when the policy is not unconstitutional on its face. *Tuttle*, 471 U.S. at 824 ("[C]onsiderably more proof than the single incident will be necessary

35

in every case to establish both the requisite fault on the part of the [entity], and the causal connection between the 'policy' and the constitutional deprivation."). Accordingly, Children's Hospital is entitled to qualified immunity under § 1983.

### ii. *Dr. Jennifer Bowden – Children's (individual capacity)*

When Dr. Bowden took over as attending physician, on December 2, 2016, she became Minor Siefert's primary physician. Doc. 105, PageID 1485. In her medical notes, she announced the continued "collaboration" with the County on several different occasions. Doc. 113, PageID 3400, 3406, 3409. That said, simply mentioning some form of collaboration with the County does not clearly show that Dr. Bowden caused or contributed to the deprivation. Although Minor Siefert remained under her care, Dr. Bowden only engaged with Minor Siefert for a few weeks after Dr. Almeida went on vacation. Under these circumstances, Dr. Bowden is entitled to qualified immunity under § 1983.

### iii. *Kimberley Stephens, LISW – Children's (individual capacity)*

Ms. Stephens, the Children's social worker assigned to the case, had consistent communication with the Sieferts regarding the status of their daughter's discharge, including, in her medical notes, stating that JFS held "the key" to where Minor Siefert would be placed. Doc. 129, PageID 6588. Ms. Stephens further indicated that there was "nothing that she could do" regarding the child's discharge. Doc. 98, PageID 770–71. But following the meeting held November 28, 2016, Ms. Stephens' notes reflect that she planned to "hear from [the] JFS Worker to discuss [a] plan for [Minor Siefert] to be discharged to [a] foster home," which shows that Ms. Stephens played an active role in the discussions regarding Minor Siefert's placement. Doc. 129, PageID 6533; Doc. 108, PageID 1662, 1689; *See Duffy*, 588 F.2d at 743–44 (stating that liability under § 1983 can be shown "by setting in motion a series of acts by

others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."). Ms. Stephens also participated in phone calls and meetings, including the initial meeting held after Humana's adverse determination letter, *see id.*, and one held November 28, 2016, *see* Doc. 129, PageID 6532, to discuss issues related to discharge with the Sieferts, Ms. Heeney, and Ms. Butler. Because Ms. Stephens clearly contributed to the deprivation of the Sieferts' parental due process rights to be given a hearing within a reasonable period after requesting the release of their daughter, she is not entitled to qualified immunity under § 1983.

### iv. *Dr. Daniel Almeida – Children's (individual capacity)*

Dr. Almeida wrote in his medical notes that "JFS gave clear recommendations to not allow [Minor Siefert] to be discharged to [her] parents." Doc. 129, PageID 6501. Unlike Dr. Bowden's note which merely mentions "collaboration" with JFS, Dr. Almeida's medical note shows that he closely aligned himself with the instructions or directives given by the County regarding Minor Siefert's care and who held ultimate authority to allow her to be released to her parents. Given these facts, Dr. Almeida is not entitled to qualified immunity under § 1983 as he contributed to the deprivation suffered by the Sieferts.

### v. *Dr. Ankita Zutshi – Children's (individual capacity)*

Like Dr. Almeida, Dr. Zutshi's medical notes are telling. Dr. Zutshi wrote that Minor Siefert was "not to be discharged" and that "the parents [could not] take" her home despite their demands. Doc. 113, PageID 3336. She also noted that hospital staff were directed to call for security if the Sieferts showed up to see their daughter at the hospital. *Id.* ("If parents are in unit, security also needs to be called. Staff on unit and resident on call made aware of the

said plan."). These facts sufficiently show that Dr. Zutshi contributed to the deprivation in this case. Therefore, she is likewise not entitled to qualified immunity.

### vi. *Moira Weir– JFS (individual capacity)*

Ms. Weir's involvement in this case is minimal. Even so, Plaintiffs argue that Ms. Weir's liability stems from her role as a supervisor for the County, as she oversees 900 JFS employees. Doc. 140, PageID 7728–32; Doc. 142, PageID 7865. Regarding Ms. Weir's potential liability, *Bellamy v. Bradley* counsels that supervisory liability will lie if the official in charge "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Plaintiffs allege that Ms. Weir should be liable under § 1983 because she failed to act once she knew of the Sieferts' complaints regarding the custody process. Plaintiffs further allege that she ignored the activity logs regarding the Sieferts even though she knew that the case was a difficult one. Doc. 140, PageID 7731. Plaintiffs also assert that Ms. Weir's instructions to her staff to focus on communicating with the Sieferts was sufficient to demonstrate her approval of the constitutional violation. *Id.*

Here, the record reveals only that Ms. Weir was responsible for implementing policies, delegating cases to her staff, and for forwarding matters for her staff's review, but her actions stopped there. Doc. 115, PageID 5601, 5586–90. Ms. Weir's authority to lead her employees, and passing emails along, does not reflect that she in any way encouraged or directly participated in the constitutional violation. Her "passive role" in the case and generalized statement for staff to focus on further communication with the Sieferts does not evidence a sufficient connection to the deprivation in this case—Defendants' failure to provide the Sieferts with a hearing or some other form of procedural due process during their daughter's

hospitalization. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). Put differently, Ms. Weir's statement and the deprivation are not sufficiently related to show her specific encouragement or direct participation.

The evidence does not show, for example, that Ms. Weir directed her staff to keep Minor Siefert in the hospital; or that she directed them to keep the Sieferts away from their daughter; or that she instructed her staff to refuse Mr. Siefert's discharge requests, if present, all of which would have shown direct participation and encouragement of the deprivation. Nothing of the sort occurred here. Finally, Plaintiffs request that Ms. Weir be held liable based on her alleged failure to act given that she knew the matter was sticky, *see* Doc. 140, PageID 7731, is also without merit because "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory*, 444 F.3d at 751 (citation omitted). As a result, Ms. Weir is entitled to qualified immunity under § 1983.

vii.    *Eric Young – JFS (Rachael Butler's Supervisor) (individual capacity)*

As noted above, supervisory liability will not attach unless Mr. Young "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy*, 729 F.2d at 421. As opposed to Ms. Weir, Mr. Young was actively involved in the Sieferts' case, and on November 30, 2016, Mr. Young met with the Sieferts. Doc. 99, PageID 941. During that meeting, the Sieferts verbally communicated to him that they wanted Minor Siefert released from Children's. *Id*. But Mr. Young, along with Ms. Butler, communicated that JFS was simply "bound by the . . . doctors' recommendations." *Id*. However, after a December 7, 2016, meeting between the two "Mr. Young and Ms. Butler both agreed that [Minor Siefert] could not go home." Doc. 129, PageID 6569. Because Mr. Young actively

39

participated in discussions with the Sieferts and took an active role in preventing their daughter's discharge, he is not entitled to qualified immunity under § 1983.

viii.     *Rachael Butler – JFS (individual capacity)*

Ms. Butler, the JFS case worker assigned to Minor Siefert's case, instructed Children's staff to either call the JFS helpline, hospital security, or 9-1-1 if the Sieferts attempted to remove their daughter from the hospital. Doc. 129, PageID 6510. Because Ms. Butler contributed to the deprivation, she is not entitled to qualified immunity under § 1983.

To recap, the Court finds that Children's, Dr. Bowden, and Ms. Weir are entitled to qualified immunity. But Ms. Stephens, Dr. Zutshi, Dr. Almeida, Mr. Young, and Ms. Butler are not entitled to qualified immunity due to their individual, specific conduct which contributed to the constitutional violation found by the Court to have been suffered by Plaintiffs based on the undisputed factual record presented in the case.

### C. Plaintiffs' Motion for Partial Summary Judgment

What remains, then, is Plaintiffs' Motion for Partial Summary Judgment. Doc. 134. Plaintiffs ask the Court to enter partial summary judgment, leaving the amount of damages as "the only issue for trial." Doc. 134, PageID 6998. In the motion, Plaintiffs reiterate much of their previous argument regarding state action and qualified immunity. In this filing, however, Plaintiffs also request economic and non-economic damages of $30,000.00, nominal damages, and an unspecified amount of punitive damages. *Id*. at PageID 6991–97.

As to these assertions, Plaintiffs claim that their spiritual beliefs were in deep conflict with Defendants' "predatory transgender tactics," which included recommendations that Minor Siefert use puberty blockers, cross-sex hormones and surgery. *Id*. at PageID 6992–93. Plaintiffs also assert that Defendants' actions "led to [Minor Siefert's] wish for hormones and

eventually it led to the removal of her breasts." *Id*. Lastly, Plaintiffs assert that they "suffered substantial emotional harm" as a result of Defendants' actions and due to the "epidemic of girls wanting to be boys." *Id*. On these bases, Plaintiffs contend that the requested damages are warranted.

Because a reasonable jury could return a verdict for either party based on the issue of consent (*see* Section B(i)(2)), Plaintiffs' request for partial summary judgment is denied. *Liberty Lobby Inc.*, 477 U.S. at 248. To be clear, there are two possible outcomes as this case proceeds toward trial: one where a jury finds that Plaintiffs' oral requests for their daughter's discharge were sufficient and another where those requests are deemed insufficient because they were not memorialized in writing as required by the Children's Consent for Medical Treatment form. Based on these facts before the Court, a "sufficient disagreement" exists that demands placing this matter in the hands of a competent jury. *Moore*, 8 F.3d at 340.

## V.    CONCLUSION

For the reasons stated, the Court finds that Children's Hospital, Dr. Almeida, Dr. Bowden, Dr. Zutshi and Ms. Stephens qualify as state actors upon consideration of the factors established by the Sixth Circuit in *Siefert*. By contrast, Dr. Sampang and Ms. Heeney do not meet the criteria for characterizing them as state actors because their actions failed to advance Children's symbiotic relationship with the County. The Court finds that Children's Hospital, Dr. Bowden, and Ms. Weir are entitled to qualified immunity under 42 U.S.C. § 1983. However, Ms. Stephens, Dr. Zutshi, Dr. Almeida, Mr. Young, and Ms. Butler are not entitled to qualified immunity due to their individual, specific conduct which connects them to the due process violation that occurred in this case.

41

Additionally, the Court finds that there is a genuine dispute on whether Plaintiffs sufficiently revoked consent after signing Children's authorization form. Accordingly, the Court **DENIES** the Motions for Summary Judgment (Docs. 120, 121) filed by Defendants and **DENIES** Plaintiffs' Partial Motion for Summary Judgment (Doc. 134). The Court will set this matter for a Telephone Status Conference by separate entry.

**IT IS SO ORDERED.**

January 2, 2026

Jeffery P. Hopkins
United States District Judge